**INTERBOROUGH NEWS COMPANY,**
Plaintiff-Appellant,

v.

The **CURTIS PUBLISHING COMPANY,** Curtis Circulation Company, S-M News Company, Inc., McCall Corporation, Popular Science Publishing Company, Inc., Meredith Publishing Company, Reader's Digest Association, Inc., Hearst Magazines, Inc., Macfadden Publications, Inc., Pocket Books, Inc., Walter D. Fuller, Benjamin Allen, Victor E. Lance, William A. Rogers, Robert E. Haig, Sol N. Himmelman, and S. O. Shapiro, Defendants-Appellees,

Fawcett Publications, Inc., Hillman Periodicals, Inc., National Comics Publications, Inc., Independent News Co., Inc., Publishers Distributing Corporation, Field Enterprises, Inc., Roscoe Fawcett, Allan Adams, O. J. Elder, Alexander L. Hillman, Philip Keenan, Paul H. Sampliner, Harry Donenfeld, Irving S. Manheimer, Robert F. DeGraff, Wallis E. Howe, Jr., and George B. Davis, Defendants.

No. 287, Docket 23487.

United States Court of Appeals
Second Circuit.

Argued May 3, 1955.

Decided Aug. 26, 1955.

**290**

Webster Sheffield & Chrystie, New York City (Bethuel M. Webster, John V. Lindsay and Bancroft G. Davis, New York City, of counsel), for plaintiff-appellant.

Cravath, Swaine & Moore, New York City (Albert R. Connelly and Edward C. Perkins, New York City, of counsel), for defendants-appellees The Curtis Pub. Co., Curtis Circulation Co., Walter D. Fuller, Benjamin Allen and Victor E. Lance.

Whitman, Ransom & Coulson, New York City (Robert E. Coulson, Forbes D. Shaw and E. Kendall Gillett, Jr., New York City, of counsel), for defendants-appellees S-M News Co., Inc., McCall Corp., Popular Science Pub. Co., Inc., Meredith Pub. Co. and William A. Rogers.

Lord, Day & Lord, New York City (Thomas F. Daly and John W. Castles 3d, New York City, of counsel), for defendant-appellee The Reader's Digest Ass'n, Inc.

McCauley & Henry, New York City (Thomas A. Brennan and Harvey L. Lipton, New York City, of counsel), for defendants-appellees Hearst Magazines, Inc., and Robert E. Haig.

Joseph Schultz, New York City, for defendants-appellees Macfadden Publications, Inc., S. O. Shapiro and Sol N. Himmelman.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Samuel J. Silverman and Jay H. Topkis, New York City, of counsel), for defendant-appellee Pocket Books, Inc.

Before CLARK, Chief Judge, MEDINA, Circuit Judge, and DIMOCK, District Judge.

MEDINA, Circuit Judge.

In this triple-damage case, based upon an alleged conspiracy or combination among defendants to restrain trade and to monopolize in violation of the antitrust laws, Sections 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15, 26; Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, plaintiff appeals from a judgment entered at the close of plaintiff's case, dismissing the complaint "on the ground that on the facts and the law plaintiff has shown no right to relief." As certain counterclaims have not yet been determined, the case is here by certificate under Fed.Rules Civ.Proc. rule 54(b), 28 U.S.C.A.

Prior to 1947, plaintiff Interborough had built up its business as a local wholesaler of magazines, periodicals and paper bound reprints to such an extent that, except for the distribution by American News Company, Interborough did the wholesaling for all the defendant publishers and distributors and others in the Greater New York area and to some extent elsewhere. The operation functioned through the medium of franchises which were said to be issued to Interborough by the various national distributors, covering designated territory, and Interborough handled the multifarious details affecting the distribution of the magazines and reprints to the retail "outlets," such as stationery stores, street corner and pier news stands, hotels and clubs, there being between 6500 and 8500

such "outlets" in the metropolitan area at the close of World War II. This was an extensive and complicated undertaking; and the concentration of the wholesaling of the product of so many leading distributors in the hands of Interborough was in no small measure due to the significant fact that it was not practical for any single distributor, even with so substantial an output as Curtis or Hearst or S-M News Company, to furnish the clerical and delivery personnel and equipment necessary to service the requirements of these thousands of retail "outlets," except at a prohibitive expense.

There is no dispute about the fact that over the years, but not continuously, Curtis found the Interborough service unsatisfactory, and in 1947, under circumstances which will be later discussed to some extent, the Curtis franchise was cancelled, and there were organized under the aegis of Curtis thirteen new wholesaling units, which handled the Curtis distribution, and, ultimately, that of the remaining defendants and others. There were many ups and downs; some of defendants left Interborough and then went back; the allocations of territory were changed; there was much haggling over the procurement of additional services or the reduction of charges. For a very considerable period the thirteen new competing wholesalers were paid large sums of money by way of subsidy by Curtis, as the Curtis business alone was far from sufficient to enable them to operate profitably. Immediately after the loss of the Curtis business, Interborough was faced with the all but impossible task of reducing its operating costs in proportion to its reduced revenues; the defection of others aggravated this condition; troubles with the unions made matters worse; and, finally, in June of 1949, the New York City department of Interborough closed down and never resumed operations.

The principal issue litigated at the trial was whether the end of prosperous times for Interborough, and its ultimate collapse, were due to the competition of the market place, in the midst of which even giants may fall, or were due to a combination among defendants to restrain trade in and to monopolize the wholesale independent[1] distribution of magazines and reprints by withdrawing their patronage and putting Interborough out of business—what plaintiff's counsel insist was an illegal "group boycott." The trial judge found that there was no combination or conspiracy between any of defendants; that neither Curtis nor any of the other defendants had any intent to restrain trade or to monopolize; that Curtis "had a legitimate economic interest in seeking the other defendants' patronage for" the thirteen new competing wholesalers, thus reducing its subsidy payments; and that each defendant acting on its own independent judgment, "although under much persuasion by Curtis," transferred its business away from (or to) Interborough, according to what each considered its best interests. Upon this record we cannot say these findings were clearly erroneous.

We are told that for some time prior to the events in controversy here there were thirteen independent national distributors of magazines and reprints; some of them were also publishers. Nine of these independents, together with certain parent corporations and a number of individuals, were made defendants in this action. With a brief but not complete enumeration of the magazines distributed and also in some cases published by them, the five defendants against whom this appeal is taken are: Curtis (Saturday Evening Post, Ladies Home Journal, Holiday, Esquire and Coronet); S-M (Reader's Digest, McCall's, Popular Science, Better Homes & Gardens, Redbook); Hearst (Cosmopolitan, Good Housekeeping, Harper's Bazaar, Motor);

---

1. In the jargon of the industry reference is made to American News Company as in a class by itself, the other national distributors being designated independents.

Macfadden (True Story, True Romances, Photoplay, Physical Culture); Pocket Books. These national distributors are conceded to be in active competition with one another, as they distribute competing products.

For many years prior to 1947 Interborough was the wholesaler for all thirteen independents, including the nine defendant distributors and Triangle, Leader, Popular and Kable. The average monthly delivery in Interborough's City Department ran between 7,000,000 and 9,000,000 copies of magazines and reprints; and of this total 1,000,000 were Curtis products. A series of disputes over alleged unsatisfactory service led Curtis to the conclusion that it would find new local distributors in the suburban part of the New York City market, and the announcement of this decision on April 28, 1947, led to the cancellation of the entire franchise by Interborough. This made it necessary for Curtis to find some new means of distribution in New York City within thirty days, an eventuality which came as no complete surprise to Curtis. Thus it was that the thirteen new competing wholesalers were set up and subsidized by Curtis. The record shows quite plainly that Curtis made persistent and almost continuous efforts to induce other national distributors to leave Interborough and come over to the thirteen new competing wholesalers. There is the usual confusion in memoranda and reports depending upon the interest of the person reporting; perhaps some vague promises were made and there was doubtless much equivocation, as the basic objectives of the various defendants were antagonistic and competitive. If optimum service were to be rendered to Curtis by the thirteen new competing wholesalers, it requires little argument to demonstrate that the service to Hearst or to the others might suffer; and it was of the utmost consequence to each of the national distributors that its magazines or reprints should reach the "outlets" in timely fashion and that proper accounts and checkups be made and other miscellaneous services

rendered. In any event, Triangle was the first to follow Curtis, but this was not until October, 1947, the new Curtis wholesalers having started operations on June 4, 1947. Hearst followed at the end of May, 1948; and S-M in June, 1948. Fawcett, Macfadden and Pocket Books made the transfer in July, 1948.

There then ensued further competitive efforts on behalf of Curtis and Interborough, with the result that Hearst, Macfadden and Fawcett gave their franchises back to Interborough with some limitations as to territory, and after some tall and successful bargaining for concessions. They ultimately left Interborough again; and on June 20, 1949, the end came.

■ It would serve no useful purpose to follow the bypaths into the numerous collateral issues, as, with one possible exception, they all lead back to the question of combination or conspiracy. This one exception related to the galley business in Ohio, which is referred to throughout as plaintiff's "second claim." The galley business was the distribution by mail and express and, as the trial judge found, this method had become outmoded, archaic, expensive and unsatisfactory. Interborough declined to progress to the more effective method of reshipment and truck delivery; certain of the national distributors tried out the proposed new system and it proved to be successful. We can find no basis for disturbing the conclusion of the trial judge that, here again, the loss of this Ohio galley business was due to the "force of economic pressure" and "not by reason of any conspiracy to restrain or monopolize interstate commerce."

But plaintiff insists that there was a concerted plan to which the various defendants consciously adhered, and that this parallel action requires a finding of combination or conspiracy, even in the absence of any direct proof of agreement by the alleged co-conspirators. And we are earnestly urged to discover here a "group boycott," which, we are told, is necessarily illegal *per se*.

The alleged plan or scheme is said to be outlined in a memorandum of a conference on April 3, 1947, between certain representatives of Curtis and S-M. The substance of it is that S-M is confidentially informed of Curtis' reasons for contemplating the elimination of Interborough as its wholesaler in Westchester, Nassau, Staten Island and Jersey City, and the setting up of new wholesalers in Bronx, Manhattan, Brooklyn and Queens, in the event of a cancellation of the entire franchise by Interborough. It contains the statement, "[W]e tell you of this plan because these Agents (the new wholesalers) would be available for other desirable magazine franchises." But this adds nothing of consequence to what has already been described. S-M was the only national distributor who knew of the contemplated change, and the reason for informing S-M was doubtless the hope that Curtis could induce S-M to patronize the new wholesalers when they were set up, should Interborough refuse to continue its City service after the suburban business had been cut off. As it turned out, this hope was long deferred, although there is no reason to doubt that S-M was willing to lend some encouragement. That Curtis was doing its best to influence and persuade S-M to take its business from Interborough and give it to the new competing wholesalers is plain enough. But these efforts for a long time met with but indifferent success. If, at the time of the conference of April 3, 1947, Curtis thought there might be some possibility of inducing S-M to act with Curtis on a joint basis, the documentary evidence establishes conclusively that no joint action was agreed upon or taken.

■ The nub of the matter is that the peculiar features of schemes for price fixing and elimination of competition which appear in such leading cases as Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 and United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, are wholly absent here. Curtis had a legal right to break away from a wholesaler whose service it considered unsatisfactory and to set up and encourage by subsidy new competing wholesalers; and there is no reason apparent to us why Curtis should not use every reasonable effort to influence and persuade other national distributors to patronize the new competing wholesalers. In this connection it is not without significance that the trial judge found: "Each defendant independently negotiated its agreements with its respective wholesalers. Each new wholesaler was in spirited competition with plaintiff and each other." These findings are abundantly supported by the evidence.

■ This was no plan or scheme to stifle competition or to fix prices or to regulate production, but rather an effort by Curtis to get better service and to induce as many of the other national distributors as they could to make a similar change, in order that the subsidy payments by Curtis might be reduced or eliminated. And the end result was that the thirteen new competing wholesalers occupied the position formerly held by Interborough, all of which came about due to the inexorable forces of competition rather than as a result of any illegal conspiracy or concert of action, by prearrangement or otherwise. The competition as between the defendants was wholly unaffected.

These observations also suffice to dispose of the claim that there was an illegal boycott and therefore a *per se* violation of the Sherman Act. United States v. Terminal Railroad Ass'n of St. Louis, 1912, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810; Arkansas Brokerage Co. v. Dunn & Powell, 8 Cir., 1909, 173 F. 899, 35 L.R.A.,N.S., 464. Use by competitive units of the same local distributor is not necessarily a limitation on their competition. After all, Interborough had no vested interest in the wholesaling of magazines and reprints in New York City or elsewhere.

Other authorities on which plaintiff leans heavily furnish no support to plaintiff's contentions because in each of them there was some feature of price fixing or stifling of competition. Butterick Pub. Co. v. Federal Trade Commission, 2 Cir., 1936, 85 F.2d 522; Fashion Originators' Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219.

Plaintiff's astute and experienced counsel with commendable industry have collated a considerable number of words and phrases from the various documents in evidence from which it is deduced that the so-called "facts" thus gathered together were "either completely disregarded or unduly minimized in the findings" made by the trial judge, whose lengthy opinion is criticized as inadequate. But this reference to alleged omissions in the opinions of trial judges is more or less typical in antitrust cases when they reach the appellate stage; and we find no substantial basis for the charge here. The trial judge followed the case with painstaking care and the factual conclusions arrived at are well supported by the evidence. Had he attempted to discuss in detail every reference relied upon by plaintiff, the opinion would have been expanded to an inordinate degree, without serving any useful purpose. True it is that meetings provide an opportunity for conspiratorial action and such expressions as "pressure," "generally understood" and "commitments" often are the hallmarks of conspiratorial action by businessmen in violation of the antitrust laws. But, as often as not, these words considered in their full context and the attendant circumstances turn out to have no significance whatever. A discussion in the opinion of all the minutiae of these inevitably complicated cases is more likely to lead to burdensome prolixity and confusion. It is clear to us that every phase of the case received due consideration.

Affirmed.