270 F.2d 146
 Charles LAWLOR and Mitchell Pantzer, Co-partners, Trading as
Independent Poster Exchange, Appellants,
v.
NATIONAL SCREEN SERVICE CORPORATION, Warner Bros. Pictures
Distributing Corp., Columbia Pictures Corp., Loew's
Incorporated, BKO Radio Pictures, Inc., 20th Century Fox
Film Corporation, United Artists Corp., Universal Film
Exchanges, Inc., Paramount Film Distributing Corp.
 No. 12793.
 United States Court of Appeals Third Circuit.
 Argued May 27, 1959.
Decided Aug. 27, 1959, Rehearing Denied Sept. 18, 1959.
 
 Francis T. Anderson, Philadelphia, Pa., for appellants.
 Louis Nizer, New York City (Walter S. Beck, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, W. Bradley Ward, Edward W. Mullinix, Louis J. Goffman, Mitchell E. Panzer, Schnader, Harrison, Segal & Lewis, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., on the brief), for appellees.
 Before GOODRICH, KALODNER and STALEY, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 In this long-protracted litigation, plaintiffs Charles Lawlor and Mitchell Pantzer seek injunctive relief and money damages pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C.A. 15, 26, averring violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. 1, 2.
 
 
 2
 The plaintiffs, in 1942, instituted a treble-damage suit, also praying an injunction, against National Screen Service Corporation and three of the eight producers who are defendants in the present action. By stipulation of the parties the suit was dismissed with prejudice on April 21, 1943. On August 18, 1949, the present complaint was filed seeking an injunction and treble damages for the period from 1943 to 1949. In 1951 Judge McGranery granted plaintiffs' motion for summary judgment as against National Screen, but a final decree was never framed. Thereafter, in 1953, Judge Kirkpatrick granted defendants' motion to dismiss on the grounds that the 1943 judgment was res judicata of this claim. This court affirmed the judgment, 3 Cir., 1954, 211 F.2d 934. The Supreme Court reversed, 1955, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122, and remanded the case. Chief Judge Kirkpatrick thereupon entered summary judgment against National Screen and upon review this court reversed, 3 Cir., 1956, 238 F.2d 59. Certiorari was granted and the Supreme Court vacated the judgments and remanded the cause to the district court for trial, 1957, 352 U.S. 992, 77 S.Ct. 526, 1 L.Ed.2d 540.
 
 
 3
 The case was then tried to the court, without a jury, and after a lengthy trial the court concluded that none of the defendants had violated the antitrust laws. The district court made 140 findings of fact and 12 conclusions of law. Based upon the foregoing, the court entered a formal order on October 31, 1958, dismissing the action as to all defendants, and the plaintiffs appealed. In effect the trial court held that plaintiffs had failed to sustain their burden of proof. For the plaintiffs to succeed on this appeal they must show that erroneous legal tests were applied to essential findings of fact or that the findings themselves were clearly erroneous within Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. United States v. E. I. duPont de Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264.
 
 
 4
 This case involves a field of endeavor collateral to the distribution and exhibition of motion picture films, the distribution of motion picture advertising accessories. These accessories consist primarily of lithographed posters containing photographs of scenes from the pictures which they are intended to advertise, and other articles for theater lobby and billboard display in and about motion picture theaters.[1] They are designed to stimulate public attendance at the current or future exhibition of the particular motion picture for which they are created.
 
 
 5
 Plaintiffs, as partners trading under the name of Independent Poster Exchange, have been engaged since 1940 in the business of leasing standard accessories to motion picture exhibitors in the Philadelphia motion picture area (comprising eastern Pennsylvania, southern New Jersey, and Delaware). Defendant National Screen, during part of the period covered by this suit, was engaged, among other things, in the business (a) of distributing to exhibitors advertising accessories for motion pictures of some producers; and (b) of creating, manufacturing and distributing such accessories of other producers; and for part of the period in suit (c) of creating, manufacturing and distributing such accessories of all of the producers or distributors alleged here to be involved. The other defendants are the eight major American motion picture distributors, hereinafter referred to as the film companies.[2]
 
 
 6
 Inasmuch as motion pictures are dependent in great measure upon effective advertising for their success, the film companies necessarily expend large amounts of money for that purpose. The direct interest of the motion picture distributors in the results of this advertising is pointed up by the fact that the pictures are at times licensed at a rental based upon a percentage of box office receipts. Among the numerous means of advertising employed in such promotions are the local pin-point advertising by the exhibitors which includes standard accessories. The court found that regular use by exhibitors of such accessories is one of the essential means of obtaining maximum attendance at and revenue from the exhibition of motion pictures; however, the degree to which they are responsible for motion picture patronage is not established.
 
 
 7
 Standard accessories have been in use for many years and, historically, the general practice had been for the motion picture company to design and manufacture the various types of accessories and distribute them to exhibitors through the company's branch offices or exchanges. As standard accessories cannot be used for any motion picture other than the one for which they are created, and as it is impossible to predict accurately the future success of a motion picture and therefore the quantity of accessories that will be required, there is an obsolescence risk that varies from item to item.
 
 
 8
 As it is a practice in the industry to exhibit feature motion pictures in a number of theaters on successive runs, the same accessories may be repeatedly used by different exhibitors. This fact resulted in the appearance upon the business scene of what came to be known as 'poster renters.' These individuals or organizations were unconnected with any producer or distributor of motion pictures, but rather obtained supplies of standard accessories and rented them to exhibitors for use with the particular picture being exhibited. The supplies were originally obtained by purchase from the film companies' exchanges, from exhibitors, or from other poster renters. By the nature of their business they were in competition with the local exchanges of the film companies for exhibitor customers. The poster renters offered a complete or almost complete rental service for accessories of all the major film companies, while the local exchanges serviced only their own films. The latter, however, made them available along with the film itself. Thus each had advantages, and by 1940 there was at least one poster renter in business in nearly every motion picture exchange area.
 
 
 9
 As a result of the competition from poster renters, the obsolescence risk, the cost of maintaining a special accessories department, the supervision and personnel requirements both in the national offices and the district exchanges, Paramount in 1939 recognized that the accessories feature of its business was operating at a substantial annual loss. Although it was apparent that one possible solution for reducing the losses was to increase the license fees, this alternative was considered undesirable as it was likely to decrease the use of such advertising and therefore be self-defeating. The Paramount executives concluded that it was preferable to delegate the tasks of creating and distributing standard accessories to an independent contractor who possessed the experience, skill and facilities necessary to successfully undertake the operation. Paramount approached National Screen in the latter part of 1939 with a proposition to turn over these functions to it. National Screen, although it was not then in the business of creating standard accessories, had been engaged, since about 1935, in the business of producing and distributing certain motion picture specialty accessories. It had invested substantial sums in and was chiefly responsible for the development of a full line of specialty accessories. Under contracts licensing it to do so, National Screen was producing and distributing to exhibitors specialty accessories for films produced or distributed by United Artists, Loew's, and Columbia.
 
 
 10
 Paramount indicated that it would require National Screen to maintain a local branch in each city where Paramount had a film exchange, to open these new offices and staff them at its own expense, to manufacture and distribute a full line of standard accessories for Paramount pictures, and to purchase its existing inventory of standard accessories. As these obligations would involve substantial expenditures, National Screen required that it be given an exclusive license to produce and distribute Paramount standard accessories for a five-year term. On December 22, 1939, the parties formally entered into such a contract, to expire on January 31, 1945.[3]
 
 
 11
 Shortly thereafter, RKO, which also had a long history of unprofitable results from its accessories business and had even engaged an expert in the field to no avail, was approached by National Screen with an offer to undertake distribution of its accessories. On January 31, 1940, Advertising Accessories, Inc., the affiliate of National Screen, entered into a five-year contract with RKO to manufacture and distribute, under exclusive license, a full line of standard accessories.[4]
 
 
 12
 Subsequently, discussions between Advertising Accessories, Inc., and Universal ensued; however, no contract was consummated as the parties were unable to agree on terms. During 1940 Columbia also considered transferring its accessories responsibilities to National Screen but was reluctant to do so fearing a loss of control over this important means of advertising. Negotiations with Warner did, however, result in a non-exclusive license agreement for the distribution of Warner standard accessories on September 26, 1940.[5]
 
 
 13
 At approximately the same time, plaintiffs initiated their business in Philadelphia, announcing to exhibitors by printed notices their entry into the business of renting standard accessories. They procured their supplies of standard accessories for Columbia, Loew's, Fox, United Artists, Universal and Warner pictures at the exchanges in Philadelphia maintained by the respective companies. In addition they indicated to exhibitors their willingness to buy such accessories from them provided they had not been released over two months. The film companies, during the period that they manufactured and distributed standard accessories, made them freely available to plaintiffs who obtained only such items for which they had firm orders from exhibitors. Thus they were neither required nor did they maintain a full line of accessories, buying only infrequently the larger items such as 24-sheets and 6-sheets.
 
 
 14
 National Screen beginning in 1940, in addition to manufacturing and distributing standard accessories for RKO and Paramount, rented standard accessories for pictures of other film producers which it obtained from the several exchanges. The following year, it began negotiating a manufacturing and distributing contract with Loew's which had been experiencing losses in regard to this aspect of its business. After consultation with its branch exchange managers and in an effort to turn these financial losses into an ensured profit, Loew's entered into a ten-year exclusive contract with National Screen on February 6, 1942. Loew's, however, agreed to furnish the completed art work and still negatives from which the mats would be prepared. At plaintiffs' request Loew's arranged for them to obtain standard accessories from National Screen in the future, and their requirements were supplied under this arrangement until April 21, 1943.[6]
 
 
 15
 Early in 1942, plaintiffs organized an association of independent poster renters. At its initial meeting it was determined that an antitrust action be brought against National Screen, Paramount, RKO, and Loew's. The suit (entitled Allied Poster and Supply Corporation v. National Screen Service Corp., Civil Action No. 2472) was instituted by plaintiffs and twelve others and alleged that the three existent exclusive licenses that contemplated licenses of a similar character constituted a violation of the antitrust laws. After protracted negotiations the suit was settled on April 21, 1943. The plaintiffs therein agreed to a dismissal with prejudice by the district court and executed a general release to National Screen, while National Screen agreed to grant plaintiffs a sublicense under which it undertook to make available for distribution a full supply of whatever accessories it was then manufacturing under license or would manufacture under future licenses. The district court in the instant case expressly found that the settlement agreement was entered into by the plaintiffs with full knowledge and understanding of its terms, after careful consideration and upon the advice of counsel.
 
 
 16
 Over a period of years following this settlement, National Screen entered into contracts for the manufacture and distribution of standard accessories of Universal, Columbia, United Artists, Warner Brothers, and Fox. The district court found that each of the film companies involved in this suit entered into the contracts for a good and sufficient economic reason, namely, to terminate an unprofitable feature of its business. These Findings were based upon the testimony of responsible executive officers of each of the companies that they had neither consulted nor conferred with executives of other film companies in arriving at their individual decisions, but rather had done so solely for vaild business reasons that did not depend in any way upon the action of any other company with respect to a similar arrangement.
 
 
 17
 As additional companies entered into contracts with National Screen, plaintiffs, pursuant to the sublicence agreement, obtained standard accessories for the pictures produced by the new companies from National Screen. The original sublicense agreement was extended for another five-year term, terminating on April 30, 1951. Although the instant complaint contained allegations that National Screen had deliberately been slow in deliveries and utilized tie-in arrangements to frustrate plaintiffs in their competition, the district court found that plaintiffs had offered no evidence sufficient to sustaine these allegations. The court also found that plaintiffs had other sources for standard accessories, some licit and at least one illicit.
 
 
 18
 Since the settlement of the Allied case in 1943, National Screen has granted 24 sublicenses, eleven to parties who were not plaintiffs in that suit. It was additionally found that during the period covered by this suit poster renters in other motion picture areas manufactured and distributed standard accessories of various types. The plaintiffs, however, never attempted to manufacture or obtain the right to manufacture or fabricate any kind of accessories.
 
 
 19
 During the years in controversy, 1943-1949, plaintiffs' gross income doubled and profits increased. In competition with National Screen for exhibitor-customers, plaintiffs succeeded in increasing their clientele mostly at the expense of National Screen. The prices plaintiffs paid to National Screen varied from item to item; however, dispite an inflationary spiral and increases in the prices plaintiffs charged their customers, the prices National Screen charged were not increased at all until May 1, 1949. Furthermore, the pre-May 1, 1949, prices averaged substantially less than those which the film companies had formerly charged. This situation obtained even after the May 1, 1949, increase.
 
 
 20
 Appellants rely on three main arguments in an effort to obtain reversal of the judgment below, namely (1) per se invalidity of the exclusive licenses granted National Screen,[7] (2) the erroneous nature of certain findings of fact, and (3) 'that on the facts found plaintiffs are entitled to judgments for both injunction and damages against all defendants.'
 
 
 21
 Consideration of the inital contention need not detain us unduly for the issue of per se invalidity of these exclusive agreements was extensively discussed in Lawlor v. National Screen Service Corp., 3 Cir., 1956, 238 F.2d 59. As was stated at page 65, 'exclusive agreements are not per se violation of the anti-trust laws and are permitted in circumstances where the facts disclose a course of conduct and reasonableness of action not prohibited by the anti-trust laws.' On appeal, the Supreme Court stated, 'We agree with the Court of Appeals that the motion for summary judgment should have been denied. (Summary judgment had been entered by the district court on the ground that the contracts were invalid per so.) However, in our view, this disposition of the case made it unnecessary for the Court of Appeals to pass on any other issue than that of the per se invalidity of exclusive contracts under the Sherman Act.' Lawlor v. National Screen Service Cirp., 1957, 352 U.S. 992, 77 S.Ct. 526, 1 L.Ed.2d 540.
 
 
 22
 Appellants in their main brief make an oblique attack on the extensive findings of fact made by the district court. They imply that the findings are erroneous because the district court allegedly accepted many of those proposed by the defendants. A study of the record, the proposed findings, and the undisputed facts lends no credence to what is not even dignified by a direct argument. Plaintiffs ask us to accept their version of the facts and, in effect, to ignore the district court's findings, that is, to try the case de novo. Extensive citation of authority is not necessary to point up the fallacy of this argument. The Supreme Court had occasion to consider the problem in United States v. Yellow Cab Co., 1949, 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150, where it was stated 'that for triers of fact totally to reject an opposed view impeaches neither their impartiality nor the propriety of their conclusions.' Rule 52, Federal Rules of Civil Procedure, directs us not to set aside findings of fact unless clearly erroneous. Where the evidence would support a conclusion either way, a 'choice between two permissible views of the weight of evidence is not 'clearly erroneous." Id., 338 U.S. at page 342, 70 S.Ct. at page 179. Furthermore, even plaintiffs do not contend that the trier of fact uncritically adopted all the defendants' tendered findings of fact nor can they that a substantial number of the findings were uncontested.
 
 
 23
 In their reply brief plaintiffs take issue with four specific findings, namely, 138, 72, 41, and 116. Finding 138 is to the effect that during the period in suit 'plaintiffs suffered no damage or injury to their business or property as a result of any action of any of the defendants herein complained of by the plaintiffs.' In refutation of this finding, plaintiffs contend that specialty accessories formed a large part of National Screen's business and they allege that these accessories were not made available to them by National Screen. Admitting that they have never participated in the specialty accessory rental business, they attribute this inactivity to the fact that such accessories, since 1940, have been obtainable only from National Screen. Plaintiffs have not here pointed to any evidence that National Screen refused to supply specialty accessories. Indeed, the mass of credible evidence is to the effect that from the inception of plaintiffs' business they never held themselves out as renters of specialty accessories, they purchased only two specialty type accessories (40 X 60 posters) during the period when those accessories were available from the film companies and lost money with respect to them, they refrained from purchasing specialty accessories from another available source even though one of the partners was active in the organization of that source, and, finally, as late as May 9, 1949, in a letter to the Attorney General of the United States, plaintiffs in describing their business made no mention of specialty accessories but rather stated, 'Our own company performs in eastern Pennsylvania, south Jersey and Delaware, distributing these standard accessories to the motion picture theatre accounts, either through outright sale or on a rental basis.' Plaintiffs also predicate their claim of damages or injury upon the fact that press books[8] published by the film companies contained information that standard accessories were available from National Screen, the fact that posters manufactured and obtained from National Screen bore a printed notice on their face indicating that they were the property of National Screen,[9] and that National Screen's gross receipts, in the Philadelphia area during 1943-1949, on standard accessories were 4 1/2 times that of plaintiffs. On the basis of the above summarized facts, plaintiffs assert that they have proved both the fact of damage and amount of loss. They cite for this proposition Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. v. Southern Photo Materials Co., 1927,273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684. These cases, however, merely stand for the proposition that having established the fact of damage or legal injury, the difficulty of determining the amount of damage will not preclude a recovery. Here there was a finding of fact, clearly borne out by the record, that there was no damage or legal injury. The evidence outlined above, relied upon by appellants here, certainly falls far short of that which would be necessary to overturn a finding of fact of the trial court.
 
 
 24
 We have considered the exceptions noted in the reply brief with regard to findings of fact 72, 41 and 116. They amount merely to quibbles concerning the meaning of language that is clear on its face. Finding of fact 72 is illustrative of this. It relates to the settlement agreement that terminated the prior litigation. On the basis of substantial evidence in the record, the district judge found that the agreement had been entered into voluntarily. At the most, the evidence cited by the plaintiffs merely indicates the motives that impelled the plaintiffs to enter into what they admitted to be a voluntary agreement.
 
 
 25
 Finally, we are drawn to what plaintiffs have termed 'the point of overriding importance,' i.e., whether or not, on the facts found by the district court, plaintiffs are entitled to both an injunction and damages against all the defendants. Of course, this issue is disposed of, as we have noted above, by the district court's explicit finding, upon the record, that no cognizable damages or legal injury were caused plaintiffs.
 
 
 26
 There are, in addition, other considerations which compel the same result. Plaintiffs have never attempted to obtain from any of the film companies licenses under which they themselves would manufacture accessories and, in fact, have expressly stated that they do not desire such licenses. In the absence of such demand upon the part of plaintiffs, the courts have consistently held that there can be no recovery in an antitrust action. Webster Rosewood Corp. v. Schine Chain Theatres, Inc., 2 Cir., 1959, 263 F.2d 533; ,J. J. Theatres, Inc. v. Twentieth Century-Fox Film Corp., 2 Cir., 1954, 212 F.2d 840. See also Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 1951, 190 F.2d 561, certiorari denied, 1952, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680.
 
 
 27
 The district court found that standard accessories created and manufactured for one motion picture can only be used in connection with that picture. Thus they are not competitive articles. It was also found that each of the motion pictures is copyrighted and the license agreements required National Screen to manufacture standard accessories utilizing scenes and incidents from these movies. The copyright law confers upon the owner of the copyright a limited monopoly as regards his copyrighted material and as an incident thereof confers upon the owner the right to license others. The license may be exclusive and, if so, by its very nature it grants the right to exclude others. Goldsmith v. Commissioner of Internal Revenue, 2 Cir., 143 F.2d 466, certiorari denied, 1944, 323 U.S. 774, 65 S.Ct. 135, 89 L.Ed. 619. This is not to say that owners may use their copyrights to deter competition or to extend the monopoly or to break down competition in other areas. United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236. Here, however, the articles being licensed for manufacture and distribution are noncompetitive in nature and, therefore no mere increase in the number of licenses obtained by one individual accomplishes a restraint upon trade or limitation in the source of supply. In the closely akin patent field this situation and its legal effect have been before the courts on a number of occasions. In United States v. Winslow, 1913, 227 U.S. 202, 33 S.Ct. 253, 255, 57 L.Ed. 481, perhaps the leading case, Justice Holmes was called upon to consider whether the formation of the United Shoe Machinery Company by the owners of three basic but noncompetitive patents, all employed in the manufacture of shoes, constituted the new corporation a monopoly. He stated that 'The machines are patented, making them is a monopoly in any case, the exclusion of competitors from the use of them is of the very essence of the right conferred by the patents * * *. It is hard to see why the collective business should be any worse than its component parts.' More recently the Supreme Court had occasion to review the problem in Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, and confirmed the fact that the mere accumulation of patents is not in and of itself illegal. We see no rational basis for treating copyrights any differently than patents, and a careful study of the record convinces us that this accumulation of copyright licenses was not used for improper purposes.
 
 
 28
 It is abundantly clear to this court that the plaintiffs, by their own choice, are nothing more than jobbers in the field of standard accessories, and thus come within the purview of cases involving exclusive dealerships such as Locker v. American Tobacco Co., 2 Cir., 1914, 218 F. 447 at page 450, where it was stated:'We are unable to discover anything illegal in a manufacturer of tobacco disposing of his goods to a jobber to sell to retailers, or, if he deems it advisable, to change his policy, and sell direct to the retailer himself. Why may he not do so? One who desires to become a jobber has no right to complain because the manufacturer chooses another to do this work, unless the manufacturer owes some duty to consign his product, or a part of thereof, to him.'
 
 
 29
 As was said by the court in Interborough News Co. v. Curtis Publishing Co., 2 Cir., 1955, 225 F.2d 289, 293, 'Use by competitive units of the same local distributor is not necessarily a limitation on their competition. After all, Interborough (plaintiffs herein are similarly situated) had no vested interest in the wholesaling of magazines and reprints in New York City or elsewhere.'
 
 
 30
 One last aspect of this case deserves mention. In an effort to show a conspiracy, plaintiffs rely upon United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, and Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, which hold that conspiracy may be established not only by express agreement but also by a showing of adherence to concerted action which has been contemplated or invited. Not only have the plaintiffs here failed in their proof of an 'arrangement,' 'plan,' or 'scheme' but the great weight of credible evidence clearly shows that the film companies, acting independently, as a result of substantial losses in their accessory business, decided to license an outsider to perform that phase of their business. They contracted with National Screen because no comparable firm was available to undertake the task. The most that can be gleaned from the factual pattern is that the business climate affected each of the film companies in a substantially similar way and they individually decided to extricate themselves from a losing proposition. Judge Holtzoff, in deciding Orbo Theatre Corp. v. Loew's, Inc., D.C.1957, 156 F.Supp. 770, affirmed per curiam, 1958, 104 U.S.App.D.C. 262, 261 F.2d 380, certiorari denied, 1959, 359 U.S. 943, 79 S.Ct. 725, 3 L.Ed.2d 677, aptly pointed out the relevant considerations:
 
 
 31
 '* * * Parallel action may indeed be concerted action, but it may also be due to the fact that the persons concerned arrived at the same simple solution of a common business problem. Here the problem was a comparatively simple one, and the solution reached was more or less obvious. If the various officers and employees involved in the decision refrained from testifying on this point, the court might well draw an adverse inference. On the other hand, considering the fact that there was absolutely no evidence of the alleged conspiracy, beyond the taking of parallel action; that each of the participants denied any communication or consultation with any of the co-defendants' and that none of the witnesses was in any way impeached or gave any testimony that was inherently incredible, several of them being members of the bar, the Court is not justified in finding that the actions were jointly planned or concerted. In fact, the Court cannot do so without also reaching the conclusion that some of these witnesses testified falsely. There is, however, no basis for ascribing such reprehensible action to any of them. The Court, therefore, concludes that the plaintiff did not establish by a preponderance of the evidence that there had been a conspiracy on the part of the defendants * * *.' 156 F.Supp. at pages 775-776.
 
 
 32
 At the argument of this appeal, we were presented with a motion to vacate an order of the district court directing that plaintiffs shall not employ the full text of the financial terms and provisions of the license agreements between National Screen and its licensors, the film companies. The order provided that the full text of other provisions of the agreements might be used but that only a summary of the financial terms, to be prepared by National Screen, might be used. Inasmuch as the precise terms were not necessary to plaintiffs' case, and seeing no compelling reasons for vacating the order, the motion will be denied.
 
 
 33
 Judgment will be affirmed.
 
 
 
 [1]
 Traditionally certain types of accessories have become known in the film industry as 'standard accessories.' The standard accessories involved in this case are:
 (a) 8 X 10 inch 'stills' (black and white photographs);
 (b) 11 X 14 inch lobby displays;
 (c) 22 X 28 inch lobby displays;
 (d) 14 X 36 inch insert cards;
 (e) one sheets;
 (f) three sheets;
 (g) six sheets;
 (h) twenty-four sheets.
 Additional accessories of varied sizes and shapes have been conceived and used in the industry and have become generally known as 'specialty accessories.'
 
 
 [2]
 During the period involved in this case, defendants Columbia Pictures Corporation, Loew's Incorporated, RKO Radio Pictures, Inc. (subsequently RKO Teleradio Pictures, Inc.) and Twentieth Century-Fox Film Corporation (subsequently TCF Film Corporation) were major producers and distributors of motion pictures in the United States. Defendants United Artists Corporation and Warner Bros. Pictures Distributing Corporation (formerly Vitagraph, Inc.) were major distributors of motion pictures, the former for independently produced pictures and the latter for pictures produced by its parent company, Warner Bros. Pictures, Inc. Defendant Paramount Film Distributing Corporation, a wholly-owned subsidiary of Paramount Pictures, Inc., was a major distributor of motion pictures produced or released by its parent. Universal Film Exchanges, Inc., a wholly-owned subsidiary of Universal Pictures Company, Inc., was a major distributor of motion pictures produced by its parent
 
 
 [3]
 The contract was extended until December 31, 1949, by a letter agreement dated December 28, 1945. The original contract also obligated National Screen's affiliate, Advertising Accessories, Inc. The affiliate merged with National Screen on July 18, 1941
 
 
 [4]
 This contract was later extended to January 31, 1950, by a supplemental agreement dated October 6, 1944
 
 
 [5]
 This agreement was for a term of one year and was extended by letter agreement for successive yearly periods up to and including August 31, 1945
 
 
 [6]
 After April 21, 1943, plaintiffs procured supplies from National Screen under the terms of a license agreement
 
 
 [7]
 'Statement of Questions Involved
 '1. Are the federal antitrust laws violated when each of the eight major American motion picture companies grants to the same person, on a profit-sharing basis, an exclusive license, of national scope, to service exhibitors with advertising posters?' Appellants' Brief, page 1.
 
 
 [8]
 A printed pamphlet published by the film companies for each picture giving suggestions or advice to exhibitors with respect to their advertisement of the picture
 
 
 [9]
 The printed notice read as follows:
 'Property of National Screen Service Corp. Licensed for display only in connection with the exhibition of this picture at your theatre. Must be returned immediately thereafter.'