TAXI WEEKLY, INC., Plaintiff-Appellee,

v.

METROPOLITAN TAXICAB BOARD OF
TRADE, INC., et al.,
Defendants-Appellants,

and

Taxicab Bureau, Inc., et al., Defendants.

Nos. 1069, 1199, Dockets 76–7042, 76–7175.

United States Court of Appeals,
Second Circuit.

Argued May 24, 1976.

Decided July 13, 1976.

Seymour D. Lewis, New York City (Rosenman, Colin, Freund, Lewis & Cohen, New York City, David W. Cohen and Paul E. Levine, New York City, of counsel), for appellants.

Charles A. LaTorella, Jr., New York City, for appellant Botwinick.

Alan R. Wentzel, New York City (Casey, Lane & Mittendorf, Charles M. Pratt and Philip R. McKnight, New York City, of counsel), for appellee.

Before SMITH, HAYS and MESKILL, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Taxi Weekly, Inc. (hereinafter, "the corporation") is a publishing firm which produced two specialized publications, primarily for distribution to the New York City taxi industry. The corporation's larger publication, *Taxi Weekly* (which was sometimes also distributed under the label *Taxi Age*), was the leading trade newspaper of the New York taxi industry, until the events giving rise to this lawsuit. The demise of *Taxi Weekly* and the consequent insolvency of its parent corporation are at the core of this controversy and formed the basis for the action tried below.

*Taxi Weekly* was sold and distributed mainly in two ways. The large fleet own-

ers of the New York City cab industry would buy *Taxi Weekly* in bulk and distribute copies free of charge to their driver-employees. *Taxi Weekly* was also purchased directly by those independent cab drivers who own their cars, rather than work as paid employees of the fleet owners.

With a partial change in the ownership of the corporation, there developed a certain amount of strain in the relationship between the corporation and some of the large fleet owners. In the summer of 1964, the fleet owners began canceling their subscriptions to *Taxi Weekly*. Soon thereafter, a rival trade paper was formed with the support of the fleet owners. Later, *Taxi Weekly* began losing its major advertisers. The upshot of these developments was the demise of *Taxi Weekly* as a commercially successful publication. Since *Taxi Weekly* was the major source of income for the parent corporation, the demise of *Taxi Weekly* quickly led to the financial failure of the corporation.

The corporation claims that the failure of *Taxi Weekly* was not the result of legitimate economic circumstances. Rather, the corporation asserts that *Taxi Weekly* lost the business of the fleet owners and major advertisers because certain of the fleet owners were determined to destroy *Taxi Weekly* and organized a successful group boycott of subscribers and advertisers to achieve that end.

Accordingly, the corporation began an antitrust action in the United States District Court for the Southern District of New York (Thomas P. Griesa, *Judge*), charging that the demise of *Taxi Weekly* was the result of a group boycott conducted in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the New York Donnelly Act, Gen.Bus. Law § 340. Named as defendants were the fleet owners who allegedly organized and participated in the boycott of *Taxi Weekly*, the Metropolitan Taxicab Board of Trade, Inc. (hereinafter, the "MTBOT") which was the trade association of the New York City fleet owners, and the executive director and public relations man of MTBOT.

After a jury trial, the defendants were found liable to the corporation for antitrust damages of $225,000, before trebling.[1]

The defendants appeal the decision of the district court on three grounds. First, they assert that the court below lacked jurisdiction to entertain the corporation's action. Second, the defendants-appellants argue that the evidence presented at the trial failed, as a matter of law, to establish their antitrust liability. Third, the defendant-appellants maintain that the damages awarded by the jury were excessive and without any basis in fact.

The executive director of the MTBOT, defendant-appellant Botwinick, also raises certain evidentiary and procedural claims which apply only to his position.

Finding no merit in any of the asserted grounds for appeal, we affirm the decision of the district court as to jurisdiction, liability and damages.

## I. Jurisdiction

It is well-established that, for jurisdiction under the Sherman Act, it is necessary for the conduct complained of to have "occurred in . . . or substantially affect . . . interstate commerce." *Lieberthal v. North Country Lanes, Inc.*, 332 F.2d 269, 270 (2d Cir. 1964). See also *Burke v. Ford*, 389 U.S. 320, 321, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967). The defendant-appellant fleet owners argue that *Taxi Weekly* was merely a local newspaper with no substantial participation in or effect upon interstate commerce. Because the impact of *Taxi Weekly* was purely intrastate in nature, the fleet owners argue, the demise of that paper did not have the requisite interstate consequences for Sherman Act jurisdiction.

Judge Griesa, relying on *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), rejected this argument, holding that *Taxi Weekly* did have sufficient interstate impact to establish

---

1. Several other defendants were either dismissed from the action by Judge Griesa or exonerated by the jury. Their status is not relevant to this appeal.

Sherman Act jurisdiction. We agree with Judge Griesa.

In *Lorain Journal*, a local, small city newspaper (the Journal) was held to have violated the Sherman Act by refusing to carry advertising for those merchants in the area who also purchased advertising from a local radio station. In rejecting the argument that the conduct complained of was purely intrastate in character, the Supreme Court held that the Journal's actions vis-a-vis the local radio station had sufficient interstate implications for invocation of the Sherman Act. Because the Journal and the radio station disseminated significant amounts of news from out-of-state and advertised many goods manufactured out-of-state, the Journal's actions were held to have sufficient interstate impact for the Sherman Act to have been violated. *Lorain Journal, supra* at 150–52, 72 .S.Ct. 181.

■ The facts in the instant setting are indistinguishable. *Taxi Weekly* frequently ran out-of-state stories of interest to the taxi industry in New York City. The advertisers of *Taxi Weekly* were largely manufacturers of cars and automotive parts who produced at and delivered from plants outside of New York state. Thus, under the standards of *Lorain Journal, Taxi Weekly* was an instrument of interstate commerce whose improper demise had sufficient interstate implications to establish jurisdiction under the Sherman Act. See also *Hospital Building Co. v. Trustees of the Rex Hospital,* —— U.S. ——, 96 S.Ct. 1848, 48 L.Ed.2d 338, 44 U.S.L.W. 4683 (1976); *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 395 (4th Cir. 1974).

The fleet owners attempt to avoid the implications of *Lorain Journal* by arguing that, in that decision, the Supreme Court was defining the quantum of interstate impact necessary for a substantive violation of the Sherman Act, but not the level of interstate involvement necessary for Sherman Act jurisdiction.

Such an argument is without merit.

■ "Congress, in passing the Sherman Act, left no area of its constitutional power unoccupied; it 'exercised all the power it possessed.'" *United States v. Frankfort Distilleries,* 324 U.S. 293, 298, 65 S.Ct. 661, 664, 89 L.Ed. 951 (1945). In other words, interstate commerce for the purposes of the Sherman Act is coterminous with interstate commerce under the Constitution.

Nevertheless, the fleet owners imply that, notwithstanding the teaching of *Frankfort Distilleries,* interstate commerce for the purposes of Sherman Act jurisdiction is to be defined less expansively than interstate commerce for the substantive purposes of the Sherman Act. Such a construction of the Act implies that certain restrictions in interstate commerce may violate the Sherman Act substantively, but fall outside the Act's jurisdiction.

The conflict between this restrictive construction of the Act and the expansive construction compelled by *Frankfort Distilleries* is apparent. If the Act constituted an exercise of "all the power" Congress constitutionally possessed to regulate interstate commerce, the jurisdictional definition of interstate commerce cannot be more restrictive than the substantive one, for then an area of interstate commerce would be jurisdictionally unreachable under the Act.

In short, *Lorain Journal* is, as Judge Griesa held, controlling here. *Taxi Weekly* often printed out-of-state news. Advertising fees from out-of-state firms constituted a large portion of *Taxi Weekly's* incoming revenues. The demise of *Taxi Weekly* thus had sufficient interstate implications for Sherman Act jurisdiction in the court below.

## II. Liability

The fleet owners next argue that, as a matter of law, there was inadequate evidence in the court below from which the jury could properly have found the fleet owners liable. We disagree and affirm the antitrust liability of the defendants-appellants.

The fleet owners assert three grounds for reversing the district court's findings as to

their liability. First, they argue that there was insufficient evidence to prove a conspiracy among the fleet owners to boycott *Taxi Weekly*. Second, the fleet owners argue that, if they did conspire together, they lacked the intent to destroy *Taxi Weekly* and therefore did not violate the Sherman Act. Third, the defendant-appellant fleet owners assert that their conspiracy, assuming it did exist and was the cause of *Taxi Weekly's* demise, did not restrain trade or diminish competition within the meaning of the Sherman Act since another newspaper for the cab industry took the place of *Taxi Weekly*.

None of these arguments is persuasive.

■ It is, of course, not our responsibility to examine the evidence in this case *de novo*. Rather, we are to review the evidence in the light most favorable to the party prevailing below, i. e., the corporation, to determine if there was a reasonable basis for the jury's decision. *Michelman v. Clark-Schwebel*, 534 F.2d 1036, 1038 (2d Cir. 1976).

■ Utilizing this legal standard, we conclude that there was an adequate basis from which the jury could have found that the defendant-appellant fleet owners, acting individually and in their respective capacities as officers of MTBOT, formed a conspiracy with the intent to drive *Taxi Weekly* out of business.

On July 13, 1964, an industry meeting was held at the office of defendant-appellant Botwinick, the executive director of the MTBOT. In attendance, in addition to Botwinick, were MTBOT's public relations man and its attorney, as well as leaders of the New York driver-owners. The next day, each of the defendant-appellant fleet owners called the corporation to cancel his subscription to *Taxi Weekly*. The fleet owners who canceled on July 14, 1964 all called the corporation within a single, half-hour period. Two of the fleet owners who canceled during that half-hour deluge had earlier increased their subscriptions to *Taxi Weekly*. Indeed, none of the fleet owners who canceled on July 14, 1964 had ever complained personally to the corporation about any aspect of *Taxi Weekly*.

Moreover, each fleet owner who canceled on July 14 was an official of MTBOT, and the MTBOT staff man for public relations, who attended the July 13 meeting in Botwinick's office, was active behind the scenes in forming a trade publication to rival *Taxi Weekly*. Finally, the major advertisers of *Taxi Weekly*, who sold cars and equipment to the fleet owners on a large scale, were pressured by certain of the fleet owners to cancel advertising placed earlier in *Taxi Weekly*.

This evidence provided an adequate basis from which the jury could have concluded that the fleet owners formed a conspiracy, dating from at least July 13, 1964, designed to force *Taxi Weekly* out of business through concerted cancelations of subscriptions, pressure upon major advertisers and the sponsorship of a competitor to eliminate *Taxi Weekly*. The record supports the conclusion that there was a conspiracy and that it had as its goal the economic destruction of *Taxi Weekly*.

The defendants-appellants nevertheless cite *Interborough News Co. v. Curtis Publishing Co.*, 225 F.2d 289 (2d Cir. 1955) and argue, on its authority, that there is insufficient evidence here upon which antitrust liability can be predicated.

Such reliance on *Interborough* is misplaced.

In *Interborough*, a company (Interborough) which had been distributing magazines in the New York area for various publishers found that the publishers were switching their business from Interborough to other distributing agencies. These competing distributors had been organized "under the aegis" of one of the publishers who had become unhappy with Interborough's service. *Interborough, supra* at 291. The publisher who had helped organize the new distributing agencies apparently proselytized among the other publishers to switch their business from Interborough to the new agencies.

Interborough claimed to be the victim of a group boycott. The trial judge disagreed and dismissed the complaint after Interborough presented its case. The Court of Appeals affirmed.

*Interborough* is clearly distinguishable on factual grounds from the situation here. The district court in *Interborough* found that each of the publishers who switched from Interborough to a competing distributor did so of his "own independent judgment." The Court of Appeals declined to hold that finding clearly erroneous. *Interborough, supra* at 291.

Indeed, the record in *Interborough* was replete with indications that the publishers who left Interborough for other distributors made the switch independently of one another. The publishers made the switch from Interborough at different times and under different circumstances. Some of the publishers went back to Interborough before leaving permanently. As the Court of Appeals observed in *Interborough*, the evidence there "establishe[d] conclusively that no joint action was agreed upon or taken" by the publishers with respect to Interborough. *Interborough, supra* at 293.

The facts here are otherwise. There was, as we noted above, ample evidence from which the jury could have inferred that there was a concerted effort among the fleet owners, from at least July 13, 1964, to destroy *Taxi Weekly*. A series of genuinely independent decisions to leave *Taxi Weekly* would have been protected by our decision in *Interborough*. A conspiracy to boycott in restraint of trade, however, is not. The concerted action to leave following the July 13 meeting and the pressure on the advertisers amply support the finding of such a conspiracy.

In short, the claim of the defendants-appellants that there is insufficient evidence to establish liability is without merit. The record thoroughly supports a finding that there was an organized effort among the fleet owners to destroy *Taxi Weekly*.

Finally, the fleet owners argue that no diminution of competition resulted from the demise of *Taxi Weekly* and that therefore no antitrust liability may be predicated upon *Taxi Weekly's* failure. According to this theory, *Taxi Weekly* cannot be viewed as an independent, self-sustaining business. Rather, the defendants-appellants assert, *Taxi Weekly* must be characterized as the official house organ of the New York City cab industry. Hence, they further claim, because *Taxi Weekly* was the cab industry's official trade paper, this court must utilize the same rules here as are applied when manufacturers switch their exclusive distributorships from one firm to another.

There is a line of cases which indicates that, under certain circumstances, manufacturers may collectively switch their business from one distributing firm to another without running afoul of the antitrust laws. If the collective decision to switch distributorships is motivated by legitimate economic considerations and not the desire to ruin the business of the old distributor, the courts have sometimes held that the Sherman Act may not be violated by such a change in distributorship. See, *e. g., Cartrade, Inc. v. Ford Dealers*, 446 F.2d 289 (9th Cir. 1971); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969).

The rationale of these decisions is twofold. First, it is often thought necessary for manufacturers to switch distributors *en masse* in good faith because of economies of scale. Second, such a switch is not thought to diminish competition since, after the decision to do business with a new distributing firm, the same number of firms are distributing the manufacturer's products as before, *i. e.*, one.

The defendants-appellants argue that such cases as *Cartrade* and *Seagram* apply here. According to this argument, *Taxi Weekly*, as the industry's house paper, is to be treated by the same rule as an industry's exclusive distributor and, therefore, any collective decision to switch patronage from *Taxi Weekly* was protected from antitrust liability by *Cartrade* and *Seagram*. As in those cases, the decision to switch from *Taxi Weekly* to another trade paper did not diminish competition since, after the switch

and its consequences were fully felt, the New York taxi industry had the same number of trade publications as before, i. e., one.

We find this argument unpersuasive.

■ Without fully analyzing the implications of *Cartrade* and *Seagram*, we note that there are two factors which distinguish the situation here from those earlier cases. First, as we observed above, the decision of the fleet owners to cancel their *Taxi Weekly* subscriptions was not a good faith decision motivated by the type of legitimate business concerns evident in *Cartrade* and *Seagram*. The fleet owners did not simply switch their business from *Taxi Weekly* in search of better service; they wanted to destroy *Taxi Weekly*. Whatever protection *Cartrade* and *Seagram* may give, that protection does not extend to situations where there is, in addition to any legitimate economic considerations for switching firms, also an intent to destroy one of the businesses in question.

■ Second, on the facts of this case, *Taxi Weekly* was not the house organ of the New York cab industry and, therefore, we must reject the fundamental premise of the fleet owners' argument, i. e., the asserted similarity between *Taxi Weekly's* status as an official trade paper and the situation of the exclusive distributorships in *Seagram* and *Cartrade*. *Taxi Weekly* was an independent, closely-held, corporation owned by private shareholders with no connection to the cab industry. *Taxi Weekly* received no subsidy or support from the industry, other than the fees paid for subscriptions. *Taxi Weekly's* editorial policy was often adverse to the interests of the fleet owners, who now nevertheless claim that the paper was their house organ. *Taxi Weekly* was oper-

ated for profit. It had no official sponsorship from the MTBOT. *Taxi Weekly*, unlike a manufacturer's distributor, had no contract with the MTBOT or the fleet owners specifying *Taxi Weekly's* obligations to them. A substantial portion of its circulation was to independents and owner-drivers, whose interests were not always those of the fleet owners. In short, *Taxi Weekly*, while obviously involved in the cab industry by virtue of its subject matter and readership, was not a house organ. Hence, we reject the asserted similarity between *Taxi Weekly's* status as an official trade paper and the status of the exclusive distributorships in *Cartrade* and *Seagram*, on the ground that *Taxi Weekly* was not an official house organ.[2]

We therefore affirm the liability of the defendants-appellants for having participated in a conspiracy designed to destroy *Taxi Weekly* as a commercially successful venture, and we reject any defense predicated upon *Taxi Weekly's* asserted status as a house organ.[3]

### III. Damages

The fleet owners also argue that the jury awarded excessive damages to the corporation.

Our review of the record indicates that there was an adequate basis for the jury's award and, accordingly, we decline to upset the jury's calculation of damages.

The corporation computed its requested damages in the following manner. First, the average annual compensation received by the corporation's shareholders for the years 1962, 1963 and 1964 was divided into its salary component, i. e., the part earned by the shareholders for their labors for the corporation, and its profit component, i. e.,

---

**2.** In rejecting the fleet owners' characterization of *Taxi Weekly* as a house organ, we express no opinion on the validity the asserted *Cartrade-Seagram* defense would have had had *Taxi Weekly*, in fact, been an official house paper.

**3.** At trial and on appeal, the corporation has maintained that the actions of the fleet owners established liability *per se* under the group boycott cases and that, accordingly, no proof of

intent was necessary to establish the fleet owners' liability. See, e. g., *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 211–12, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Since we hold that there was adequate evidence from which an intent to destroy *Taxi Weekly* could have been inferred, it is unnecessary for us to decide if liability could have been predicated here on a *per se* group boycott theory in the absence of such evidence.

the part of the compensation received by the stockholders *qua* stockholders. This latter figure, the shareholders' entrepreneurial profit, was further reduced by anticipated state and federal taxes. To the resulting net earnings figure, the corporation applied a price/earnings ratio of ten. This resulted in the estimation of the going concern value of the corporation at $248,230. The jury awarded $225,000 before trebling.

The fleet owners now argue, on the authority of *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir. 1975), that the corporation's expert witness miscalculated the corporation's net earnings by attributing too large a share of the owners' compensation to profit, rather than salary.

■ It is, of course, well-established that, in calculating the profits of a firm for antitrust purposes, it is necessary to separate that part of the owners' compensation which is attributable to their labor from that part of the owners' compensation which is entrepreneurial profit. Only the part of the owners' compensation which is profit can be included in the calculation of the damage award. *Standard Oil Co. of California v. Moore*, 251 F.2d 188, 219 (9th Cir. 1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).

Contrary to the assertions of the fleet owners, this is not a case like *Coleman*. In *Coleman*, no effort was made to divide the owner's income into its labor and profit components. Instead, all compensation of the owner was included in the damage calculation. *Coleman, supra* at 1352, n. 22.

That was not the situation here. The calculation did divide the $50,000 received annually by the corporation's shareholders into a salary component ($15,000) and a profit component ($35,000). Only the latter figure was included in the determination of the corporation's net earnings. The $15,000 figure reflected the expert's judgment as to the salary cost of hiring a publisher to perform the tasks executed by the corporation's owners. The residual $35,000, by definition, was held to represent entrepreneurial profit.

■ The jury was entitled to accept the $15,000 salary estimation. There is accordingly no basis for this court to overturn the award. The $15,000 figure is not clearly erroneous and, hence, it must be inferred that the other $35,000 paid to the owners of the corporation was entrepreneurial profit, properly included in the calculation of the damage award.

■ Just as a damage calculation must exclude that part of the owners' compensation attributable to the owners' labor, the award must also exclude that part of the owners' compensation which is a return to capital. *Standard Oil, supra.* Since no deduction for capital return was made by the corporation's expert, the fleet owners claim that the damage award is inflated.

■ The problem with the fleet owners' argument is that the corporation had virtually no capital beyond its nominal investment in office furniture. The fleet owners nevertheless argue that the price which one of the owners paid to buy part of the corporation must have reflected a capital investment in the corporation. This contention is obviously incorrect: the purchase price of an interest in the corporation went to the other owner of the corporation, not to the corporation itself, and that purchase price could reasonably be understood as reflecting the corporation's good will, rather than its capital stock.

In short, there was no basis for more than a *de minimis* reduction of corporate earnings for capital charges. The damage award is not vulnerable on this score.

■ Finally, the fleet owners object to the price/earnings ratio of ten used to capitalize the corporation's earnings. The essence of the fleet owners' argument is that the jury did not accept the fleet owners' attack on the corporation's price/earnings estimation.

The jury was free to accept or reject that figure after hearing the evidence for and against it. The jury's acceptance of that figure should not be overturned, particularly in light of the fact that the fleet owners presented no alternative price/earnings ra-

tio, while the corporation presented expert testimony in support.

Since the damage award was supported by evidence in the record below, we will not overturn it.

### IV. Botwinick's Individual Claims

Defendant-appellant Botwinick, executive director of the MTBOT, makes two separate arguments in addition to those advanced by the fleet owners. First, Botwinick argues that there is insufficient evidence to connect him with the conspiracy of fleet owners. Second, Botwinick argues that certain flaws in the summary offered by the corporation's counsel require reversal.

Neither contention has any merit.

Once a conspiracy is established, it requires only a minimal level of additional evidence to connect an additional individual to it. *United States v. Pardo-Bolland,* 348 F.2d 316, 325 (2d Cir. 1965). A conspiracy among the fleet owners is established by the evidence discussed above. There is, moreover, a sufficient basis for finding that Botwinick was part of it. Botwinick was the chief-of-staff of the taxi trade association, whose officers were the major participants of the boycott against the corporation. The day before the concerted cancellations of subscriptions began, Botwinick hosted an industry meeting at his office with leading driver-owners. Also in attendance on July 13, 1964 in Botwinick's office was the MTBOT public relations man who subsequently organized another trade publication to rival *Taxi Weekly.* Botwinick had acted as the fleet owners' agent in earlier discussions with the corporation concerning *Taxi Weekly's* editorial policies.

In short, there is enough evidence to implicate Botwinick in the conspiracy.

With respect to the alleged errors in the summary, Botwinick's brief admits that no objections were made at the time. Accordingly, no objections should be entertained now.

### V. Summary

As there is no basis on which to overturn the decision of the court below, its judgment is affirmed.