EXHIBITORS POSTER EXCHANGE,
INC., Plaintiff-Appellant,

v.

NATIONAL SCREEN SERVICE CORPO-
RATION et al., Defendants-Appellees.

No. 26643.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1970.

C. Ellis Henican, Jr., New Orleans, La., Glenn B. Hester, Carl E. Sanders, Augusta, Ga., Francis T. Anderson, Yeadon, Pa., Sanders, Hester, Holley, Ashmore & Boozer, Augusta, Ga., Henican, James & Cleveland, New Orleans, La., for appellant, Exhibitors Poster Exchange, Inc.

James G. Burke, Jr., Gibbons Burke, New Orleans, La., Phillip A. Wittmann, William D. Treeby, New Orleans, La., Walter S. Beck, New York City, Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for appellee National Screen Service Corp.

Stone, Pigman, Walther, Wittmann & Hutchinson, Phillip A. Wittmann, William D. Treeby, New Orleans, La., for appellees Columbia Pictures Corporation, Metro-Goldwyn-Mayer, Inc., Paramount Film Distributing Corporation, Twentieth Century-Fox Film Corporation, United Artists Corporation, Universal Film Exchanges, Inc. and Warner Bros. Pictures Distributing Corporation.

Before JOHN R. BROWN, Chief Judge, GODBOLD, Circuit Judge, and CABOT, District Judge.

JOHN R. BROWN, Chief Judge:

Here Exhibitors [1] is seeking reversal of the District Court's summary judgment in favor of the defendants. The District Court granted the summary judgment on the basis of the doctrines of res judicata and collateral estoppel, which doctrines are the natural points of dispute of such long continuing private anti-trust cases as this.

Exhibitors is a jobber or rental distributor of advertising posters for movies. There are two defendants. As a group the first—Producers—comprises the major movie companies,[2] which through their copyright rights have the sole right to produce or license the production of the advertising material for their movies. The second, and perhaps most direct, is National Screen.[3] Its economic role is a dual one (i) as the only major holder of a license to produce this material and (ii) a distributor of the material to motion picture exhibitors.

The history of the movie poster industry has been a history of almost continuous antitrust litigation since [4] the

---

1. Exhibitors Poster Exchange, Inc.

2. The movie companies that are defendants in the present action are Columbia Pictures Corporation, Metro-Goldwyn-Mayer, Inc., Paramount Film Distributing Corporation, 20th Century-Fox Film Corporation, United Artist Corporation, Universal Film Exchanges, Inc., and Warner Brothers Pictures Distributing Corporation.

3. National Screen Service Corporation.

4. The most complete history of this industry is set out in Lawlor v. National Screen Service Corp., 3 Cir., 1959, 270 F.2d 146, cert. denied, 1960, 362 U.S. 922,

early 1940s when the movie companies quit producing their own posters and started giving this right to National Screen. This litigation was produced when National Screen took steps toward vertically integrating its operation by supplying movie exhibitors directly thus eliminating the jobbers such as Exhibitors. National Screen at first did not persist in these efforts. When antitrust claims were brought it would enter into consent judgments under which it agreed to supply the jobbers with the posters it produced under the license from Producers. See Lawlor v. National Screen Service, 3 Cir., 1959, 270 F.2d 146; National Screen Service Corp. v. Poster Exchange, Inc., 5 Cir., 1962, 305 F.2d 647.

In spite of the consent judgments, several jobbers in the Philadelphia area brought another antitrust case alleging conspiracy and monopolistic practices. See Lawlor v. National Screen Service Corp., 1955, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122. Despite a momentary victory in the Supreme Court, which eliminated obstacles to a further factual inquiry, the tactic proved to be a mistake when, after the case was finally decided on the merits, the Third Circuit held that neither the licensing agreements nor the practices of National Screen were illegal. Lawlor v. National Screen Service Corp., 3 Cir., 1959, 270 F.2d 146, cert. denied, 1960, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742.

Armed now with *stare decisis*, National Screen in 1961 executed its plan to put the vertical integration into effect. That included the February notice to jobbers all over the country that it would no longer operate through middle men.

Undaunted by the Third Circuit's opinion, jobbers again brought suit. Exhibitors was no exception. On May 17, 1961, one day after the date on which National Screen was to cease supplying posters, Exhibitors brought suit in the United States District Court for the Eastern District of Louisiana against National Screen and eight Producers.[5] This became Suit No. 1.

Exhibitors alleged that the refusal to deal by National Screen and the refusal of Producers to license Exhibitors to produce posters on a local basis was a "group boycott". Thus it alleged that National Screen and Producers were violating Sections 1 [6] and 2 [7] of the Sherman Act in that they were engaged in a "contract or conspiracy in restraint of trade" and were conspiring to give National Screen a monopoly and that National Screen was monopolizing or attempting to monopolize the industry. Exhibitors sought triple damages under the private-attorney-general authority given by § 15 of the Clayton Act [8] and sought to enjoin the defendant from engaging in the alleged illegal conduct in the future.

80 S.Ct. 676, 4 L.Ed.2d 742. See also Lawlor v. National Screen Service Corp., 1955, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122; Vogelstein v. National Screen Service Corp., E.D.Pa., 1962, 204 F.Supp. 591; Lipp v. National Screen Service Corp., E.D.Pa., 1960, 188 F.Supp. 245; Poster Exchange, Inc. v. National Screen Service Corp., N.D.Ga., 1963, 35 F.R.D. 558, aff'd, 5 Cir., 1964, 340 F.2d 320; National Screen Service Corp. v. Poster Exchange, Inc., 5 Cir., 1962, 305 F.2d 647.

5. With the exception of Columbia Picture Corporation all of the movie-company defendants in the present action were also defendants in the 1961 action.

6. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *." 15 U.S.C.A. § 1.

7. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C.A. § 2.

8. 15 U.S.C.A. § 15. In Suit No. 1 Exhibitors sought $300,000 in damages.

Exhibitors was granted a preliminary injunction against all parties. But, after the depositions of Exhibitors' President, and National Screen's local manager were taken and upon motion and affidavits of officials of Producers, the Court granted a summary judgment in favor of Producers and dissolved the injunction. National Screen was, however, retained as a party defendant.

In 1964, after a pre-trial conference and as the trial with only National Screen as a defendant neared, Exhibitors filed Suit No. 2 in the same court. In Suit No. 2 the Producers [9] were again named defendants and Exhibitors again stated the same facts—the 1961 refusal to deal—but sought only to recover the damages suffered since the summary judgment in Suit No. 1. The trial on the remaining part of Suit No. 1 was postponed and the two suits were merged. All defendants—National Screen and Producers—moved for summary judgment and the Court granted all the motions. As in Suit No. 1 no appeal was taken.

Exhibitors was undaunted. Adverse judgments were the fuel on which it seemed to thrive. And in 1967 the present Suit, No. 3, was instituted against the same defendants in which Exhibitors asked for damages from the time of filing Suit No. 2. Again all defendants moved for summary judgment and the District Court by invoking the doctrines of res judicata and collateral estoppel undertook to lay the antitrust claims of this jobber to rest.[10]

The defendants pressed these doctrines on the District Court as though they were to be used as clubs to accomplish the policy embedded in them: the prevention of a repetitive litigation. The doctrines must be used, however, not as clubs but as fine instruments that protect the litigant's right to a hearing as well as his adversary and the courts

from repetitive litigation. In addition, it must be remembered that the use of these doctrines can cloak a party in perpetual immunity and thus possibly protect conduct lasting long past the prior judgment—conduct that the law may grow to abhor.

Our attempt to carve our way through these doctrines and this litigation convinces us that the District Court erred. Although res judicata and collateral estoppel do slice away much, there are still controverted issues upon which Exhibitors may recover if it can meet its considerable burden of proof.

### I.

Res judicata must first be dealt with. It is only where the prior judgment does not fit into that doctrine that there need be inquiry into the collateral estoppel effect of such judgment. Of course, the doctrine is that "a judgment 'on the merits' in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action." Lawlor v. National Screen Service Corp., 1955, 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122, 1127.

Here there is no problem with the identity of the parties. The problem is whether the present action—Suit No. 3— is "based on the same cause of action" as either Suits No. 1 or No. 2. The answer here depends on the nature of the right of action granted under the antitrust laws. It is Exhibitors' contention that the alleged wrongs—the § 1 conspiracy in restraint of trade, and the § 2 conspiracy to monopolize, and monopolization—are, if not a series of new torts successively perpetrated, at least in the nature of continuing torts. It argues that there is no res judicata effect to either judgment because each new accrual of damage gives rise to a new claim for which relief can be granted—

---

9. In Suit No. 2 Columbia Pictures Corp. was a defendant.

10. Other jobbers have also been persistent in their claims. See The Poster Exchange, Inc. v. National Screen Service Corp., N.D.Ga., 1969, 306 F.Supp. 491.

that the damages occurring since Suit No. 2 have given rise to a new cause of action.

The defendants, on the other hand, argue that there is and has been only one cause of action—the alleged concerted refusal in 1961 of the National Screen and Producers to deal with Exhibitors. They contend that there has been prior adjudication that that conduct is not in violation of either § 1 or § 2 of the Sherman Act (see notes 6 and 7 *supra*).

Exhibitors relies upon the Supreme Court's 1955 decision in Lawlor v. National Screen Service Corp., *supra,* a case involving National Screen's earlier attempt to eliminate jobbers. There National Screen and the movie companies argued that a 1942 consent judgment under which National Screen agreed to supply advertising material to jobbers was res judicata. The jobbers, however, there alleged that since the entry of the prior judgment National Screen had engaged in new monopolistic practices —deliberately slow deliveries, tie-in sales, and others—and that five other producers had joined the conspiracy.

The Supreme Court held that the prior judgment was not a bar. The Court held that the additional claims coupled with the fact that in those circumstances the continuing conduct gave rise to more than one cause of action. The Court said:

"That both suits involved 'essentially the same course of wrongful conduct' is not decisive. Such a course of conduct—for example, an abatable nuisance—may frequently give rise to more than a single cause of action. And so it is here. The conduct frequently complained of was all subsequent to the 1943 judgment. In addition, there are new antitrust violations alleged here—deliberately show deliveries and tie-in sales, among others —not present in the former action. While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not

even then exist and which could not possibly have been sued upon in the previous case. In the interim, moreover, there was a substantial change in the scope of the defendants' alleged monopoly; five other producers had granted exclusive licenses to National Screen, with the result that the defendants' control over the market for standard accessories had increased to nearly 100%. Under these circumstances, whether the defendants' conduct be regarded as a series of individual torts or as one continuing tort, the 1943 judgment does not constitute a bar to the instant suit."

At 349 U.S. 328, 75 S.Ct. 868–869, 99 L.Ed. 1127–1128.

Defendants argue that *Lawlor* is not controlling because of the subsequent, independent new antitrust violations alleged there. They find support for this distinction in Engelhardt v. Bell & Howell Co., 8 Cir., 1964, 327 F.2d 30, 36. They also point to the decision of this Court in Norman Tobacco & Candy Co. v. Gillette Safety Razor Co., 5 Cir., 1961, 295 F.2d 362 where we held that an antitrust claim was barred by the doctrine of res judicata since the same fact situation had been the basis for an unsuccessful action based upon breach of a contract to deal. But see, International Rys. of Central America v. United Fruit Co., 2 Cir., 1967, 373 F.2d 408, 419, cert. denied, 1967, 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975.

National Screen and Producers also argue that the definition of a cause of action for purposes of determining whether the statute of limitations has run is the same one that should be used here for determining if res judicata is applicable. It is clear that for Statute of Limitations purposes the courts have held that a claim under the antitrust acts is not in the nature of a continuing tort or a nuisance. For that purpose the cause of action is said to arise "from the commission of the last overt act causing injury or damage." Garelick v.

Goerlich's Inc., 6 Cir., 1963, 323 F.2d 854.[11]

These statute of limitation cases do not compel the result urged on us here. "The determination of the meaning of 'cause of action' for purposes of deciding whether or not a person has slept on his rights is of little aid in deciding whether a prior judgment is a bar to the present action." Williamson v. Columbia Gas & Electric Corp., 3 Cir., 1950, 186 F.2d 464, 469. There the concern is about preventing the presentation of stale claims: Here the concern is with preventing repetitive litigation while preserving the opportunity to be heard and insuring that the policy of the antitrust acts are carried out.

Neither *Engelhardt, supra* nor *Norman Tobacco & Candy Co., supra* is decisive. In *Engelhardt*, although the Court found it necessary to distinguish *Lawlor*, the cases were substantially different. In *Engelhardt* there was a single breach of a contract. There was one and only one refusal to deal and only one transaction. Likewise in *Norman Tobacco & Candy Co.*, where the first suit was tried on a breach of contract theory, there was one and only one transaction —essentially a prospective buyer's effort to procure and the seller's refusal to deal. In effect it was the claim that at a time certain the defendant did an illegal act which caused damages (i) between that date and the filing of the suit and (ii) since the filing of the suit down to the present and (iii) in the future.

But the statute of limitation cases do not reach situations in which the damages come—or are alleged to come—not from a prior act or series of acts which have been completed except in their consequences, but rather from actions (or non actions) subsequently occurring, either alone or in combination with the "completed" actions. Unless the statute of limitation cases are confined to the former situation a policy of repose is transmuted into an unexpected and wholly gratuitous notion of perpetual immunity. As *Lawlor* warns, it is imperative that we not "confer on [these defendants] * * * immunity from civil liability for future violations." Lawlor, *supra*, at 349 U.S. 329, 75 S.Ct. 869, 99 L.Ed. 1128.

In light of these policies we must hold that significant actions (or non actions) occurring subsequent to 1961, either alone or in combination with acts which have been completed prior to 1961 except for their consequences, may be the basis for new claims for damages traceable to such significant actions (or non actions). In that situation the harm that is claimed in Suit No. 3 is not that arising out of the particularized activities resolved in Suit No. 1 or No. 2. Old claims, then, are not being reasserted. A new claim has been alleged. Whether the new claim thus stated is one which under our federal rules is a claim upon which relief can be granted is a matter of substantive antitrust law, considered in the light of the *stare decisis* effect of the cases, and not a matter of res judicata or estoppel by judgment.

When the pleadings in the present case are given that liberal reading called for by Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80, and its progeny, see e. g. Pred v. Bd. of Public Instruction, 5 Cir., 1969, 415 F.2d 851, the District Court may con-

11. For other cases reaching this same result see Baldwin v. Loew's Inc., 7 Cir., 1963, 312 F.2d 387; Steiner v. 20th Century-Fox Film Corp., 9 Cir., 1956, 232 F.2d 190; Crummer Co. v. DuPont, 5 Cir., 1955, 223 F.2d 238, cert. denied, 1956, 350 U.S. 848, 76 S.Ct. 85, 100 L. Ed. 755; Momand v. Universal Film Exchanges, 1 Cir., 1948, 172 F.2d 37, cert. denied, 1949, 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118; Schenley Inds., Inc. v. New Jersey Wine & Spirit Wholesalers Ass'n, D.N.J., 1967, 272 F.Supp. 872; Skouras Theatres Corp. v. Radio-Keith-Orpheum Corp., S.D.N.Y., 1961, 193 F. Supp. 401; Molinas v. National Basketball Ass'n, S.D.N.Y., 190 F.Supp. 241; Fleischer v. A. A. P., Inc., S.D.N.Y., 1959, 180 F.Supp 717. For cases taking a somewhat different approach see DeLaughter v. Borden Co., 5 Cir., 1966, 364 F.2d 624, 629–630; Delta Theatres, Inc. v. Paramount Pictures, Inc., E.D.La., 1968, 158 F.Supp. 644, 649.

clude that they adequately allege that there has been new illegal conduct, not merely continuing damages from old, and now insulated, illegal conduct, in violation of the antitrust laws and therefore stating a claim upon which relief can be granted. Such a claim would be a new cause of action—No. 3 would not be No. 1 nor No. 2.

## II.

■ Although No. 3 would be a new cause of action and res judicata inapplicable thereto, Exhibitors might still be barred from further action on certain issues by collateral estoppel. The doctrine is classically stated by Mr. Justice Field in Cromwell v. County of Sac, 1877, 94 U.S. 351, 24 L.Ed. 195 when he says that in "a second action between the same parties * * * upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." at 94 U.S. 353, 24 L.Ed. 198. It forecloses inquiry only as to those issues which were necessarily determined. United States v. Burch, 5 Cir., 1961, 294 F.2d 1, 5.

■ Thus it is necessary to determine what were the "matters in issue or points controverted" in Suits No. 1 and No. 2. This determination is to be made on the basis of the prior records. The process was generally described by Mr. Justice Day: "To answer these questions, we must look to the pleadings making the issues, and examine the record to determine the questions essential to the decision of the former controversy." United Shoe Machinery Corp. v. United States, 1922, 258 U.S. 451, 459, 42 S.Ct. 363, 366, 66 L.Ed. 708, 718.

■ We reject out of hand the beguiling but superficial contention of Exhibitors that neither Suit No. 1 nor No. 2 can have any collateral estoppel effect because no summary judgment can have such effect. This is based on an overemphasis of two assertions: (1) a collateral estoppel results only from an actual decision of an issue and (2) a summary judgment results from a finding that there is no genuine issue as to any material fact.

It would be strange indeed if a summary judgment could not have collateral estoppel effect. This would reduce the utility of this modern device to zero. It would compel the useless ritual of a formal trial to get the equivalent ruling at the end of the evidence—plaintiff's, defendant's, or all—of a directed verdict. Indeed, a more positive adjudication is hard to imagine.[12] It is determination that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). And it most certainly encompasses ultimate facts of the kind here involved. The only enigma involved is determining which of one or more multiply decisive issues of fact the Court on summary judgment determined was totally lacking in legal significance. If a claim requires elements 1, 2 and 3 for recovery, summary judgment is proper if 2 is missing. But this would not give to a summary judgment based thereon a perpetual cloak to forbid inquiry into 1 or 3, or both. This would distort the wholesome policy behind collateral estoppel. As with many other wonderful tools to cope with today's exploding demands on judicial energy, care must be used by Trial Judges in reflecting the basis for their action. Thus while it is true that we and others often point out that so-called findings of fact are superfluous (if non-existent) in a summary judgment,[13] this is a long way from saying that Trial Judges should not excise the issue or issues determined to be without

12. For cases giving collateral estoppel effect to summary judgments see Hyman v. Regenstein, 5 Cir., 1958, 258 F.2d 502, 510, cert. denied, 1959, 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575; Wolcott v. Hutchins, S.D.N.Y., 1968, 280 F.Supp. 559, 563.

13. See Hindes v. United States, 5 Cir., 1964, 326 F.2d 150, 152; United States

genuine controversy. On the contrary everything in the rules and good administration calls for an articulate reflection of the basis for the Judge's ruling. Had that been done as to Suit No. 1, and again as to Suit No. 2, our task would have been greatly simplified.

But now that this is an enigma wrapped in a mystery we must follow Mr. Justice Day's instruction, United Shoe Machinery Corp., *supra*, and look to the records in Suits No. 1 and No. 2 to determine which issues were necessarily decided. The issues presented by the complaint are (1) whether the 1961 refusal to deal was the product of a conspiracy in restraint of trade between National Screen and Producers forbidden by § 1 of the Act and (2) whether under § 2 National Screen monopolized or attempted to monopolize the industry by the actions in 1961.

It is beyond doubt that Suit No. 1 disposed of the issue of whether the activities of Producers and National Screen in 1961 constituted an illegal conspiracy.[14] Except for identification of each Producer the motions for summary judgment were identical. "The above Depositions, Transcript and Letter show conclusively that Defendant [name of movie company] has never conspired to give Defendant National Screen Service Corporation a monopoly in the manufacture and distribution of motion picture advertising posters in the New Orleans area and show, on the contrary, that Defendant has at all times indicated its willingness to deal with the plaintiff, Exhibitors Poster Exchange, Inc." Whether rightly or wrongly, these facts (or legal facts) were accepted by the Trial Court. This was the only basis for the motions and this issue was thus necessarily disposed of by the court's summary judgment. We would emphasize, however, that this relates to 1961

conduct, not subsequent conduct within the reach of the complaint in Suit No. 3.

It is equally clear, however, that the summary judgment in Suit No. 1 did not dispose of any issue regarding National Screen's attempt to monopolize. But it was disposed of in Suit No. 2. This issue as well as National Screen's complicity in any conspiracy was necessarily in Suit No. 2. National Screen submitted two motions asking for relief. The first was filed on Dec. 14, 1964 before the remaining part of Suit No. 1 was merged with Suit No. 2. The second was filed on Jan. 29, 1965 after the merger. The first is entitled a motion for summary judgment and the second is entitled a motion for dismissal on the pleadings. Each motion was supported by memorandum. The theme of both is that there should be judgment for National Screen on both the § 1 issue of conspiracy and the § 2 issue of monopolization since other courts in other cases had held that on the basis of similar allegations there was no illegal conduct.

The Court granted National Screen the relief sought and gave two reasons. First, the Court believed that the doctrine of res judicata was applicable. The court gave a second reason, however. The court relied on the decision of the United States District Court for the Northern District of Georgia to find that the *Lawlor* decision by the Third Circuit was controlling on the question of the legality of National Screen's conduct. Thus the court, whether rightly or wrongly, necessarily determined judicially that the facts brought forth by deposition, pre-trial conferences, and other discovery devices did not show either monopolization, attempted monopolization, or conspiracy on the part of National Screen under §§ 1, 2 or both. But

for Use and Benefit of Industrial Instrument Corp. v. Paul Hardeman, Inc., 5 Cir., 1963, 320 F.2d 115, 116; Shehi v. Southwestern Bell Tel. Co., 10 Cir., 1967, 382 F.2d 627, 629.

14. We have obtained from the District Court the complete record in Suits No. 1 and No. 2 as well as the present case. This painstaking examination, page by page, brief by brief, was one really for the Trial Court, and more accurately, for counsel.

all was with respect to actions done or not done in 1961.

The effect of the order in Suit No. 1 and the order in Suit No. 2 is to wipe out all claims against Producers as well as National Screen arising out of actions (or non actions) of 1961, and in so far as Suit No. 2 might have expanded these actions, for damages encompassed by Suit No. 2.[15] Left open, however, are actions, if any, which may be established by proof covering post 1961 activities (or non actions) which substantively are violations of the antitrust laws and the resulting damages therefrom occurring subsequent to the cut off date of Suit No. 2.

The burden may be a heavy one, but Exhibitors is entitled to attempt to bear it. We thus must remand the case to the District Court. We do so, however, without even the slightest murmur of a suggestion as to how it will or should come out. Pred v. Board of Public Inst., 5 Cir., 1969, 415 F.2d 851, 860.

Reversed and remanded.

15. It should be emphasized that in disposing of Suit No. 2 the Trial Court considered that it was all 1961 activity which gave rise to the claim of § 1 conspiracy or § 2 monopolization. It did not undertake to view Suit No. 2 in the way we look on Suit No. 3 as alleging something new and beyond Suit No. 1. Hence, on the inquiry of what was necessarily determined in Suit No. 2 we accept the Trial Court's reading of the complaint as a claim arising out of 1961 actions with damages resulting in 1964 on.