745 F.2d 441
 1984-2 Trade Cases 66,213
 OHIO-SEALY MATTRESS MANUFACTURING COMPANY, Sealy Mattress
Company of Houston, Sealy Mattress Company of Fort Worth,
Sealy Mattress Company of Puerto Rico, Inc., Sealy of the
Northeast, and Sealy Mattress Company of Georgia,
Plaintiffs-Appellants,
v.
Morris A. KAPLAN, Sealy Mattress Company of Illinois,
William H. Walzer, Sealy Connecticut, Inc., Sealy Greater
New York, Inc., Waterbury Mattress Company, Morton H.
Yulman, Sealy of Eastern New York, Inc., Sealy of Minnesota,
Inc., Peter D. Brown, Sealy Mattress Company of Michigan,
Inc., T.C. Englehardt, Jr., Fred G. Hodges Bedding Company
(a/k/a Sealy Mattress Company of Reading, PA), Sealy of Des
Moines, Inc., Walter Hertz, Sealy Mattress Company of New
Jersey, Inc., Joseph V. Moffitt, Sealy of the Carolinas,
Peerless Mattress Company, Lloyd B. Rosenfeld, Sealy
Mattress Company of Oregon, Joseph R. Rudick, Maryland
Bedding Company, James Thompson, Howard G. Haas, Sealy,
Incorporated, Sealy Spring Corporation, Sealy Mattress
Company of Colorado, Inc., Sealy Mattress Company of
Northern California, Inc., Sealy Mattress Company of
Southern California, Inc., Sealy Mattress Company of
Arizona, Inc., Sealy Mattress Company of Florida, Inc.,
Sealy Mattress Company of Pittsburgh, Inc., and Sealy
Mattress Company of Philadelphia, Inc., Defendants-Appellees.
 Nos. 83-2321, 83-2405.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 19, 1984.
Decided Sept. 21, 1984.
 
 Frederic F. Brace, Jr., P.C., Brace & O'Donnell, Chicago, Ill., for plaintiffs-appellants.
 Rodney D. Joslin, Jenner & Block, Chicago, Ill., for defendants-appellees.
 Before PELL and WOOD, Circuit Judges, and WEIGEL, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 This case which, for purposes of clarity, we shall label Ohio II, is the second of six civil suits brought by the Ohio-Sealy Mattress Manufacturing Company (Ohio) against its licensor, Sealy, Incorporated (Sealy), and other defendants. The first civil suit, which we shall label Ohio I, was filed in 1971, and, following two appeals to this court, ultimately resulted in Ohio's obtaining a substantial damages award as well as an order of equitable relief.[1] The present appeal in Ohio II is taken from two orders of the district court entered on August 1, 1980, and June 16, 1983. The appeal, involving two challenging questions regarding the doctrine of res judicata, requires us to determine the preclusive effects of the Ohio I litigation on the Ohio II case.
 
 I. FACTS
 
 2
 Both Ohio I and Ohio II are antitrust suits brought by Ohio, one of the most successful and aggressive licensees of appellee Sealy, which owns numerous trademarks to a popular brand of mattresses and other bedding products. The resolution of this appeal makes necessary our examination of the procedural history of each suit.
 
 A. The Ohio I Litigation[2]
 
 3
 Ohio I, a marathon case which, from the filing of the complaint to its final disposition on appeal, lasted over one decade, had its origins in a 1967 Supreme Court case United States v. Sealy, Inc., 388 U.S. 350, 356, 87 S.Ct. 1847, 1852, 18 L.Ed.2d 1238 (1967). In United States v. Sealy, Inc., the Supreme Court invalidated Sealy's system of allocating mutually exclusive manufacturing and sales territories to its manufacturer-licensees. The Court found that Sealy was a joint venture of its stockholder-licensees and that the licensees were "themselves directly, without even the semblance of insulation, in charge of Sealy's operations." Id. at 353, 87 S.Ct. at 1850. Sealy's system of assigning each manufacturer an enclave free of intrabrand competition, the Court held, was therefore a horizontal market allocation per se violative of Section 1 of the Sherman Act.[3] Approximately four weeks after the Court handed down its decision, the licensee-directors of Sealy met to discuss the ramifications of the Court's ruling. Concern was expressed over the competition that could be expected from "renegade," "out of control," and "predatory" licensees no longer constrained by the exclusive territory system. Sealy thereafter developed a new Uniform License Agreement that all its licensees signed in 1968, save one whose license was reacquired by Sealy some years later. The new agreement preserved the same territories (designated Areas of Primary Responsibility or "APRs") as had been used before, and Sealy agreed not to permit any other manufacturer to produce Sealy products in a licensee's territory. The Agreement was thus exclusive as to manufacture, but it was not on its face exclusive as to sales. A licensee was permitted to sell Sealy products in another licensee's APR. Any licensee who would be inclined to sell outside his own APR, however, faced several disincentives. First, each licensee was held accountable for adequate sales in his APR. As an incentive to sell only within his APR, each licensee, once he achieved a quota of sales in his APR, had to pay only one-half the standard royalty to Sealy for all subsequent sales of Sealy products made that year inside or outside his APR. Second, there was a surcharge placed on sales outside a licensee's APR. The surcharge was termed a "passover payment," and the seller had to remit it to Sealy, which in turn paid it over to the licensee in whose territory the seller had successfully marketed his product. Although Sealy characterized the payment as one designed to prevent an out-of-APR licensee from taking a "free ride" on a fellow licensee's advertising efforts, Sealy itself conducted the great bulk of the advertising for the Sealy brand. The passover charge could run as high as eleven percent. Third, a licensee making an out-of-APR sale had to pay a one percent "product service repair" charge to Sealy. As originally conceived, Sealy was to hold these payments in a fund from which it would reimburse licensees who actually made repairs on products they had not sold, but in practice Sealy paid the charges over to "invaded licensees" whether or not they in fact made any repairs. Fourth and finally, the 1968 Uniform License Agreement limited a licensee to manufacture Sealy products at specified plant locations and prohibited the adding of plant locations without Sealy's written approval. A licensee contemplating an out-of-APR sale faced high transportation costs because of the bulk and weight of the product, and the plant location clause exacerbated this impediment to competition. A licensee who wanted to locate a plant at the periphery of his APR in order to compete more effectively against his neighboring licensees was prevented from so doing. Ohio twice sought permission to construct a plant in Toledo, Ohio, in order to compete more effectively against the Detroit licensee. On both occasions, Sealy denied Ohio's request.
 
 
 4
 Sealy also inserted into the Uniform License Agreement a clause giving Sealy the "right of first refusal" should a licensee desire to sell his business. Sealy exercised this clause against Ohio on three occasions between 1970 and 1972, thereby blocking Ohio's efforts to obtain the Philadelphia, Florida, and Pittsburgh licensees. In 1970, Ohio contracted to buy the Philadelphia licensee, but upon a complaint from the neighboring Baltimore licensee, Sealy exercised the right of first refusal and the Philadelphia licensee retracted its offer to sell. In 1972, the same sequence of events took place, but this time Sealy acquired the Philadelphia licensee. In 1970, the principal of the Florida licensee reached an agreement to transfer his business to Ohio, but he withdrew his business from sale after Sealy exercised its right of first refusal. In 1972, Ohio for a second time contracted to buy the Florida licensee but Sealy exercised its right of first refusal and acquired the Florida concern. A similar scenario was played out with respect to the Pittsburgh licensee in 1972 and 1973.
 
 
 5
 In 1971, Ohio and four wholly owned subsidiaries brought suit against Sealy and other defendants seeking both damages and injunctive relief. The claims in the complaint fell largely into two categories. First, there were claims related to the post-1967 market allocation we have just described. Second, there were claims based upon Sealy's use of tying arrangements with respect to bedding components. The latter category of claims need not concern us further. With respect to the former category of claims, Ohio sought the following: First, it requested recovery of the passover payments and product service repair charges it had remitted to Sealy, plus an injunction against future imposition of those charges. Second, Ohio sought damages based upon Sealy's refusal to allow it to locate a plant in Toledo, plus an injunction against future enforcement of the plant location clause. Third, it requested lost profits and preparatory expenses with respect to the failed acquisitions of the Philadelphia, Florida, and Pittsburgh licensees, plus divestiture by Sealy of those licensees. Finally, Ohio sought an injunction against future enforcement of the exclusive manufacturing territories provision. Following extensive pre-trial discovery, the damages claim was tried to a jury, and in April 1975 the jury returned a general verdict in excess of six million dollars in favor of Ohio.
 
 
 6
 Approximately one year after the general verdict of April 1975, district court Judge Parsons denied Sealy's motion for a new trial upon the condition that Ohio accept a fifty percent remittitur. Ohio acceded to the remittitur and thus, after trebling, received damages in excess of ten million dollars. Eight months later, Judge Parsons denied Ohio equitable relief.
 
 
 7
 Ohio I came to this Court for the first time on appeal in 1978. See Ohio-Sealy Manufacturing Co. v. Sealy, Inc., 585 F.2d 821 (7th Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979). Sealy argued on appeal that there was insufficient evidence upon which the jury could have found a system of market allocation. We agreed with Sealy that the enormity of the damages award necessarily implied the jury had found that Sealy had allocated the market and had thereby perpetuated the horizontal constraints the Supreme Court in 1967 found per se violative of the Sherman Act. We disagreed, however, with Sealy's assertion that the evidence adduced at trial was insufficient to support such a finding. Although any one of the license provisions Sealy used may not have effected a horizontal market allocation, the evidence of all of the provisions taken together, combined with the fact that most directors of Sealy were licensees, entitled the district court to let the jury decide whether Sealy had illegally divided the market. We reversed the district court, however, with respect to the denial of injunctive relief. We reasoned that the district court had failed to apprehend the jury's necessary finding that Sealy had effected a market allocation: "We think the court erred, thus, in premising its equitable relief decision on the assumption that the only fact established by the jury verdict was that at least one acquisition somehow violated the antitrust laws. Under the evidence and the instructions, and as the case was argued, the jury verdict must also be read to include a finding that Sealy was engaged in the scheme of market allocation in which one or more acquisitions were at least a part." Id. at 844. We thus remanded the case to Judge Parsons with instructions to reconsider the denial of equitable relief. We directed Judge Parsons to consider what "total mix of equitable relief, if any, might be just in the circumstances." Id. at 845 & n. 34. We also directed Judge Parsons to "consider the evidence adduced both at the jury trial and at the equitable relief hearing," and we permitted him to "take any additional evidence ... [he] might find helpful." Id. at 845.
 
 
 8
 On remand, the district court took additional evidence from the parties and concluded those evidentiary proceedings in 1979. In March of 1981, Judge Parsons entered a final decree, in which he stated at the outset that Sealy had voluntarily agreed to cease collecting passover payments, enforcing the plant location clause, or collecting product service repair charges. Judge Parsons then stated that he had decided not to enjoin Sealy from future enforcement of the exclusive manufacturing territories provision. Judge Parsons reasoned that permitting any licensee to open a plant anywhere in the nation would amount to appropriation of the licensor's property. He also stated that his enjoining enforcement of the plant location clause and collection of the surcharges on out-of-APR sales was a measure sufficient to end market allocation. Judge Parsons declined to enjoin the exercise of the right of first refusal unless Sealy's exercise were linked to an anti-competitive purpose. Judge Parsons reasoned that Sealy had a protectible interest in maintaining the quality of products bearing the Sealy label, and that the right of first refusal, if not used for anti-competitive purposes, effected legitimate control over the identity of those who manufacture under the Sealy name. Next, Judge Parsons concluded that divestiture of the Pittsburgh, Florida, and Philadelphia licensees was not required. Finally, Judge Parsons denied Ohio's supplemental motion to recover damages that had accrued since the jury verdict. Judge Parsons reasoned that Ohio had pending at that time two lawsuits in which it sought to recover those supplemental damages.
 
 
 9
 Ohio appealed from the final decree, arguing that Judge Parsons erred when he failed to (1) enjoin the exercise of the exclusive manufacturing clause, (2) order divestiture, and (3) award supplemental damages. Ohio-Sealy Manufacturing Co. v. Sealy, Inc., 669 F.2d 490 (7th Cir.1982), cert. denied, 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982). This court affirmed Judge Parsons on each point. We began our opinion by noting that an equitable decree in a private antitrust suit should fashion "injunctive relief only to the extent necessary to protect [the plaintiff] from future damages likely to occur if the defendant continues the unlawful antitrust conduct." Id. at 495. We then considered the denial of injunctive relief with respect to the exclusive manufacturing territories provision and concluded that the district court's other injunctive relief was sufficient to restore "significant intrabrand competition among neighboring licensees." Id. at 496. Although the exclusive manufacturing territories provision might prevent Ohio from competing effectively in every APR, we stated that Ohio was not entitled to secure by injunctive relief every conceivable competitive goal. Id. On the issue of divestiture, we noted that Ohio had acquired two licensees near the APRs of the Philadelphia and Florida licensees. We also stated that Ohio's Medina, Ohio, plant was near the Pittsburgh licensee's APR. We therefore concluded that Ohio Sealy could engage in significant intrabrand competition at those locations and that divestiture was accordingly unnecessary. Finally, we agreed with the district court that Ohio was not entitled to supplemental damages. With respect to supplemental damages resulting from Sealy's pre-verdict conduct, we divided the damages into two types, namely those that were provable at trial and those that were not. We stated that the doctrine of res judicata barred Ohio from recovering damages of the first type in any further Ohio I proceeding or in any subsequent law suit. We concluded that Ohio was, however, entitled to bring a fresh cause of action in a separate lawsuit to recover damages of the second type. Finally, with respect to any damages issuing from Sealy's post-verdict conduct. Ohio again had an independent cause of action that it could pursue in a separate suit.
 
 B. The Ohio II Litigation
 
 10
 In March 1976, Ohio and five wholly owned manufacturing subsidiaries filed a new suit naming as defendants, inter alia, Sealy, certain Sealy subsidiaries, Sealy's president, and several former members of Sealy's Board of Directors. The complaint was in six counts. Count I was brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. Secs. 15, 26, and sought damages and injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. Sec. 1. Distilled to its simplest elements, Count I alleged that all the practices upon which the jury based its 1975 verdict continued without change after 1975. In particular, the complaint alleged that Sealy had reenacted the Uniform License Agreement, reelected the licensee directors to Sealy's board, collected passover and product service repair charges, and "excluded Ohio from competing effectively in the Florida, Philadelphia, and Pittsburgh markets." Paragraph 92 of Count I contained the damages prayer, and it read in pertinent part:
 
 
 11
 92. Ohio-Sealy's injury by reason of all said unlawful restraints and activities has manifested itself in damages, including the following:
 
 
 12
 (a) Lost profits in connection with the loss of the acquisition of the Florida, Philadelphia, and Pittsburgh licensees.
 
 
 13
 (b) Loss of profits and increased costs of doing business in connection with refusals of a Toledo plant location in 1971 and 1973.
 
 
 14
 (c) Royalties paid on bedding not bearing Sealy trademarks and trade names.
 
 
 15
 (d) Net passover payments and warranty repair charges made by Ohio-Sealy.
 
 
 16
 Count II sought damages and injunctive relief under Section 8 of the Clayton Act, 15 U.S.C. Sec. 19, and alleged that certain individuals were at the same time directors of licensees and directors of Sealy, Inc. Paragraph 104 of the complaint, the damages prayer for Count II, stated that as a direct result of the interlocking directorate, Ohio had been injured and would continue to be injured "as set forth in Count I." Counts III through VI alleged numerous additional violations of federal law as well as state law, but these matters have now been settled or adjudicated, and none is relevant to this appeal.
 
 
 17
 In July 1979, Ohio filed a third suit, Ohio III, against Sealy and certain new directors. Sealy and the other defendants in Ohio III filed a motion to abate the action as duplicative of Ohio II. In response to that motion, Ohio amended its complaint in Ohio II, limiting the temporal scope of that complaint to the period before April 24, 1978. See Ohio-Sealy Mattress Manufacturing Co. v. Kaplan, 90 F.R.D. 40 (N.D.Ill.1980). Sealy and the district court agreed to that time limitation.
 
 
 18
 Only three matters are presently before this court on appeal, namely the damages prayers of subparagraphs 92(a) and 92(b) and a request under Count II to enjoin enforcement of the exclusive manufacturing territories provision. The prayer under subparagraph 92(c) was adjudicated below and this court affirmed the district court's decision on interlocutory appeal. See Ohio-Sealy Mattress Manufacturing Co. v. Kaplan, 712 F.2d 270 (7th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 509, 78 L.Ed.2d 698. With respect to the prayer under subparagraph 92(d), Ohio agreed below that it was foreclosed by the judgment in Ohio I from seeking recovery of payments made before the 1975 jury verdict. See Ohio-Sealy Mattress Manufacturing Co. v. Kaplan, 90 F.R.D. 11, 14 & n. 6 (N.D.Ill.1980). As to payments made after the 1975 verdict and before April 24, 1978, the defendants in Ohio II tendered treble the amount of the payments and the district court dismissed the prayer. With respect to injunctive relief under Count II, Sealy acceded to an injunction against the interlocking directorate, which left only the request for an injunction against enforcement of the exclusive manufacturing territories provision.
 
 
 19
 By order dated August 1, 1980, district court Judge Aspen granted Sealy summary judgment with respect to the damages Ohio sought under subparagraphs 92(a) and 92(b). Judge Aspen reasoned that Ohio sought post-verdict damages resulting from pre-verdict acts, and that Ohio could have established those damages at trial in 1975 by projecting them into the future and discounting them to present value. See Ohio-Sealy Mattress Manufacturing Co. v. Kaplan, 90 F.R.D. 11, 17 (N.D.Ill.1980). Hence, principles of res judicata barred Ohio from recovering post-verdict damages from Sealy, Inc. Judge Aspen also stated that principles of satisfaction of judgment barred Ohio from recovering post-verdict damages from the other defendants in Ohio II.
 
 
 20
 In May 1982, Ohio II was reassigned to District Judge William Hart. On June 16, 1983, Judge Hart ruled in an unpublished order that principles of res judicata also barred Ohio from obtaining an injunction in Ohio II against enforcement of the exclusive manufacturing territories provision. Judge Hart reasoned that in our opinion in the second appeal from Ohio I, this court had directed Judge Parsons to take all the additional evidence he needed to fashion equitable relief. In 1979, Judge Parsons in fact held an evidentiary hearing and invited the parties to submit to him evidence concerning post-verdict events that might bear on Ohio's prayer for equitable relief. In March 1981, Judge Parsons entered his final decree. Since Ohio had limited the time period of Ohio II to acts occurring before April 24, 1978, all facts relevant to the prayer for equitable relief in Ohio II were or could have been litigated before Judge Parsons. This court affirmed Judge Parsons' decree in 1982, and hence, Judge Hart maintained; the matter of enjoining enforcement of the exclusive manufacturing territories provision had been fully and finally adjudicated in Ohio I.
 
 
 21
 With the entry of Judge Hart's June 16, 1983, order, all claims in Ohio II had been dismissed, rendered moot, or settled. Final judgment was entered on June 30, 1983. Ohio now appeals from Judge Aspen's order of August 1, 1980, and Judge Hart's order of June 16, 1983.
 
 II. DISCUSSION
 A. Judge Aspen's August 1, 1980, Order
 
 22
 By order of August 1, 1980, Judge Aspen decided that Ohio's damages claim for the post-verdict consequences of the defendants' pre-verdict acts was barred by res judicata. Ohio assigns error to this point. Our resolution of Ohio's appeal requires us to examine the law of res judicata in the context of a continuing conspiracy to violate the antitrust laws.
 
 
 23
 In Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), the Supreme Court articulated the legal principles applicable to the recovery of damages resulting from ongoing conduct violative of the antitrust laws. The Court first stated that "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover damages caused by that act." Id. at 338, 91 S.Ct. at 806. Under this rule, Ohio had the right to seek post-verdict damages from Sealy's post-verdict acts. For example, when Sealy continued after the 1975 verdict to collect passover and product service repair charges, a new cause of action to recover those payments accrued to Ohio. See Lawlor v. National Screen Service Corp., 349 U.S. 322, 327-28, 75 S.Ct. 865, 868-69, 99 L.Ed. 1122 (1955); Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117, 126-29 (5th Cir.1975). Sealy does not contest that Ohio had such a right, and the claim for Ohio's post-verdict payments has in any event been resolved by settlement. The Court next stated that "each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial." Id. 401 U.S. at 338-39, 91 S.Ct. at 806. It is under this rule, Sealy contends, that Ohio is not entitled to recover in Ohio II the damages described in subparagraphs 92(a) and 92(b). The acquisitions of the Philadelphia, Florida, and Pittsburgh licensees as well as the denial of the Toledo, Ohio, plant location all occurred prior to the jury's verdict in 1975. Ohio was required to argue to the jurors sitting in Ohio I that it would incur damages into the future from the acts described in subparagraphs 92(a) and 92(b). Ohio's failure to make such an argument to the jurors sitting in Ohio I bars it forever from recovering the post-verdict damages it has suffered because of the acquisitions and denial of a new plant location. The Court placed a proviso on its second rule but Sealy maintains that even considering the proviso, Ohio is still barred. The proviso stated, "[I]t is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." Id. at 339, 75 S.Ct. at 806. In his August 1, 1980 decision, Judge Aspen considered whether the post-verdict damages Ohio sought in Ohio II might indeed be recoverable because the fact of their accrual was "speculative" or their amount "unprovable" at trial in 1975. In a carefully crafted opinion, Judge Aspen ruled that neither standard articulated in the Zenith proviso could save Ohio's claim for damages. The possibility of future damages was not so speculative as to preclude presentation to the jury. Ohio knew that Sealy would not simply yield up the Philadelphia Florida, and Pittsburgh licensees in the event of an unfavorable jury verdict. Sealy would continue to retain those licensees and hence recovery of future damages was an issue ripe for presentation to the jury in 1975. Although Ohio had chosen to seek equitable relief, including divestiture, in a later proceeding, the prospect of equitable relief did not render speculative the accrual of future damages under the Zenith proviso. Plaintiff, by his own actions, could not "create speculativeness, and then use that uncertainty as to future damages to avoid the policies underlying res judicata." Ohio-Sealy Mattress Manufacturing Co. v. Kaplan, 90 F.R.D. 11, 17 (N.D.Ill.1980). Moreover, the future damages that Ohio sought in Ohio I were capable of proof at trial in 1975 under well established methods of projecting lost profits. There is "broad latitude" in establishing antitrust damages in private suits, and although Ohio could not establish damages with "mathematical certainty," it had at its disposal the tools lawyers generally employ to make a just and reasonable estimate of future losses. Id., citing Bailey v. Meister Brau, Inc., 535 F.2d 982, 991 (7th Cir.1976).
 
 
 24
 We are unable to agree with Judge Aspen's conclusion that Ohio is barred in Ohio II from recovering post-verdict damages resulting from Sealy's pre-verdict conduct. The accrual of future damages resulting from the acquisitions of the Philadelphia, Florida, and Pittsburgh licensees and the denial of a Toledo plant was speculative at the time of the 1975 jury verdict. In order to explain our position, it is necessary to elaborate on that part of our 1978 affirmance of Ohio I that discusses the Supreme Court's then recently announced decision in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). See Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d 821, 831-33 (7th Cir.1978).
 
 
 25
 In Brunswick, the Court addressed the requirements for recovery of treble damages under Section 4 of the Clayton Act, 15 U.S.C. Sec. 15. Petitioner was a large national manufacturer of pinsetting equipment that had acquired several bowling centers after those centers defaulted on the obligations they had issued to purchase the manufacturer's pinsetting products. Respondents were bowling centers that competed with the centers petitioner acquired. At trial, respondents tried to establish damages compensable under Section 4 solely by showing that their profits would have increased had petitioner not kept the defaulting centers in business. The Court assumed for purposes of the case that petitioner's entry into a market of small concerns violated Section 7, which proscribes acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. Sec. 18. The Court held that respondents were not entitled to damages under Section 4 because the acquisitions had not caused any "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent." Id. 429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original). Respondents would have suffered the same "loss" regardless of the identity of the concern acquiring the defaulting centers. Id. If a small concern as opposed to Brunswick had acquired the centers, respondents would have incurred the "loss" without a Section 7 violation. The Court also noted that if the centers Brunswick acquired had been thriving businesses, the Section 7 violation would have been at least as plain, yet respondents could not have identified any revenue they would have received but for the acquisitions. Id. at 487 n. 12, 97 S.Ct. at 697 n. 12. In essence, respondents were seeking damages on the theory that they faced non-predatory competition from centers that otherwise would have closed, but the antitrust laws are meant to promote competition. It would contradict the purposes underlying antitrust law to award respondents profits they would have realized if fair competition had been reduced. See generally Areeda, Antitrust Violations Without Damage Recoveries, 89 Harv.L.Rev. 1127 (1976).
 
 
 26
 On the first appeal in Ohio I, Sealy argued to this court that under Brunswick Ohio had suffered no damages compensable under Section 4. We dealt with Sealy's argument as follows:
 
 
 27
 The thrust of Sealy's argument is that the competitive situation would have been the same regardless of whether the prior licensee, Ohio, or Sealy had primary responsibility for the territories in question. It insists that Ohio is merely a disappointed desirous purchaser of the licensees, and to award damages for the disappointment is a perversion of the antitrust laws. If Ohio had claimed damages here on the theory that, e.g., Sealy's acquisitions in themselves violated Section VII of the Clayton Act, Sealy's argument might have some plausibility. Sealy ignores, however, the theory Ohio argued to the jury and on which the district court gave instructions, that Sealy's exercise of its right of first refusal was a part of a scheme of market allocation, done to keep Ohio from establishing new bases from which it might effectively compete with neighboring licensees.
 
 
 28
 Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d at 832.
 
 
 29
 Thus, the critical point we made in response to Sealy's argument was that acquisitions could not be viewed in isolation for purposes of determining the recoverability of damages under Section 4. This is entirely logical as a matter of first principles. Had Sealy not enforced the plant location clause and not collected passover and product service repair charges, Ohio could have located plants on the periphery of its Georgia territory and shipped bedding products into the Florida market unfettered by external constraints. The result would have been vigorous competition between Ohio and the Florida licensee for a share of the Florida market in Sealy products. The acquisition of the Florida licensee by Sealy was compensable in Ohio I only because Sealy employed additional tactics to maintain Florida as an enclave free of intrabrand competition. Had Sealy not used other tactics to erect barriers around the Florida territory, Sealy's acquisition of the Florida licensee would have been no more compensable under Section 4 than was Brunswick's acquisition of defaulting bowling alleys. Under the same reasoning, Sealy's acquisition of the Pittsburgh and Philadelphia licensees became compensable under Section 4 only because Sealy enforced the other contract provisions that prevented Ohio from competing in those territories from its bases in Ohio and Massachusetts. Finally, Sealy's denying a Toledo plant location was compensable because Sealy erected other barriers, such as the exclusive manufacturing territories provision, that kept elevated Ohio's cost of doing business beyond its territories.
 
 
 30
 At the time Ohio asked the jury to assess damages in Ohio I, Ohio was entitled to believe that Sealy would in the future obey the nation's antitrust laws. That is, Ohio could proceed under the assumption that, in the event of a verdict in Ohio's favor, Sealy would open its territories to reasonable intrabrand competition from neighboring licensees. Judge Aspen was correct when he stated that at the time of trial Ohio could not have expected Sealy to hand the Philadelphia, Florida, and Pittsburgh licensees over to Ohio in the event the jury returned a verdict against Sealy. Judge Aspen, however, erred when he ignored all the other tricks, gambits, and ploys Sealy allegedly continued to use after April 1975 to seal off its territories from reasonable intrabrand competition. Ohio was perfectly correct to proceed under the assumption that Sealy would discontinue those tactics following an award in Ohio's favor that indicated the jury necessarily found a horizontal division of markets. It would have been absurd for Ohio to argue to the jury in 1975 that it would continue to feel antitrust injury from Sealy's acquisitions and denial of a Toledo plant location well into the future. That Sealy would not dismantle its barriers to reasonable intrabrand competition following a verdict for Ohio was highly speculative, and Ohio accordingly cannot be barred from bringing its current damages action.
 
 
 31
 This is an unusual case in that Sealy's liability in 1975 for its wrongful acquisitions of the Philadelphia, Florida, and Pittsburgh licensees and denial of a new plant location in Toledo depended directly upon Sealy's enforcement of other contract provisions that effectively sealed off Philadelphia, Florida, Pittsburgh, and the out-of-APR territory around Toledo from intrabrand competition. The post-verdict damages that Ohio now seeks are thus not, as Sealy would have us believe, "continuing damages for old and now insulated, illegal conduct." Exhibitor's Poster Exchange, Inc. v. National Screen Service Corp., 421 F.2d 1313, 1319 (5th Cir.1970) (emphasis added). The post-verdict damages sought in Ohio II necessarily required for their accrual Sealy's alleged maintenance of the host of other devices that insured the APR's in question would remain enclaves untroubled by competition from Ohio. Ohio was not required to predict that these devices would remain in place following the 1975 verdict. A contrary conclusion on our part would in effect confer on defendants immunity from civil liability for their post-verdict maintenance of barriers around Philadelphia, Florida, Pittsburgh, and the out-of-APR territories surrounding Toledo. See Lawlor, supra, 349 U.S. at 329, 75 S.Ct. at 869. We accordingly hold, with regard to the pre-verdict acquisitions of the Philadelphia, Florida, and Pittsburgh licensees and pre-verdict denial of a Toledo plant, that Ohio may proceed with its legal claim in Ohio II to recover such post-verdict damages, if any, as it is able to prove for the period between April 1975 and April 1978 as a direct result of unlawful restraint, if any, continued by Sealy after April 1975 and to April 1978.
 
 B. Judge Hart's June 16, 1983, Order
 
 32
 In its first appeal of Ohio I to this court, Ohio argued that Judge Parsons erred when he denied all equitable relief. We agreed with Ohio that Judge Parsons' denial was erroneous, and we remanded the cause to Judge Parsons with instructions to "take any additional evidence ... [he] might find helpful in fashioning equitable relief." Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d 821, 845 (7th Cir.1978). In 1979, when Judge Parsons convened the equitable relief hearing we had sanctioned, he advised the parties to submit to him additional evidence concerning post-verdict conduct:
 
 
 33
 I have decided that I will need to hear additional evidence concerning three provisions of the license agreement which remained in dispute [the exclusive manufacturing territories provision, the right of first refusal clause, and the no-competitive interests provision]. Of concern with respect to all these provisions is the fact that the financial positions of the parties, their corporate structures and the economic conditions in the relevant market may have today changed significantly over the course of this litigation. The complaint in this case was filed eight years ago. The jury verdict was handed down over four years ago. I heard post-trial evidence on equitable relief almost three years ago. Whatever changes have occurred during this time should bear substantially on plaintiffs' prayer for equitable relief.
 
 
 34
 (Emphasis added.) The relief proceeding focused largely on Ohio's challenge to the exclusive manufacturing territories provision and the issue of divestiture. Shortly before the conclusion of the hearing, Judge Parsons once again invited the parties to offer additional evidence. Finally, in a post-hearing order dated April 15, 1980, Judge Parsons advised the parties: "I should welcome any factual and explanatory assistance to me in fashioning an injunctive type order, even though it means considering transactions which post date the formal hearings [in August 1979] on equitable relief."
 
 
 35
 It is thus plain that Judge Parsons gave the parties ample opportunity to apprise the court of all post-verdict conduct that might have a bearing on Ohio's prayer for an injunction against enforcement of the exclusive manufacturing territories provision. Judge Parsons' practice of taking evidence on post-verdict conduct was clearly warranted by our 1978 instructions and as a matter of original principles. It would make little sense for a district judge to enjoin an evil no longer present or to ignore an evil that had turned acute since the time of the verdict. Cf. Champion Spark Plug Co. v. Reich, 121 F.2d 769, 772 (8th Cir.1941), cert. denied, 314 U.S. 669, 62 S.Ct. 130, 86 L.Ed. 535; Continental Securities Co. v. Interborough Rapid Transit Co., 207 F. 467, 471 (S.D.N.Y.1913) ("[E]quity acts in the present tense .... [It] mold[s] the decree to actualities not history.").
 
 
 36
 Judge Parsons ultimately granted most of the equitable relief Ohio sought, but he concluded that an injunction against enforcement of the exclusive manufacturing territories provision was unnecessary to effect reasonable intrabrand competition. We affirmed Judge Parsons' decree in the second appeal of Ohio I to this court. See Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 669 F.2d 490, 496 (7th Cir.1982). Ohio filed Ohio II in 1976 and requested, inter alia, an injunction against enforcement of the exclusive manufacturing territories provision. Judge Aspen thereafter limited the temporal scope of Ohio II to the period between April 1975 and April 1978. Judge Hart was thus correct when he held in his August 1, 1983, order that principles of res judicata barred Ohio from seeking an injunction in Ohio II against enforcement of the exclusive manufacturing territories provision. Every fact relevant to the injunction sought in Ohio II had occurred when, in March 1981, the district court entered the equitable decree in Ohio I. Ohio had a full and fair opportunity to present Judge Parsons with evidence of post-verdict occurrences that could militate in favor of enjoining exercise of the exclusive manufacturing territories provision. The fact that Ohio may not have availed itself of this opportunity is immaterial. Res judicata makes a final judgment conclusive as to the parties on all issues of fact and law that were litigated or could have been litigated. See J. Moore, J. Lucas and T. Currier, Moore's Federal Practice p 0.405 (2d ed. 1983). Ohio now seeks a second chance in which to convince the district court that events occurring up to April 1978 require a result different from the one rendered by Judge Parsons in 1981 and perfected through appeal to this court in 1982. Res judicata is appropriately applied to prevent this needless relitigation of issues fairly and conclusively decided in prior proceedings.
 
 
 37
 Ohio raises two supplemental arguments in support of its position that it is entitled to litigate in Ohio II the issue of enjoining enforcement of the exclusive manufacturing territories provision. First, Ohio maintains that Judge Parsons expressly reserved Ohio's right to litigate in Ohio II the propriety of an injunction in light of post-verdict conditions. We reject this argument for three independent reasons. First and foremost, the passage of Judge Parsons' decree that Ohio quotes in support of its position plainly refers to independent matters, namely Sealy's acquisition of its Portland licensee and Sealy's threat to revoke Ohio's license. Judge Parsons reserved addressing these issues because they were the subject of Ohio III. The reservation when read in context, however, cannot be said to refer to the exclusive manufacturing territories provision. Second, it takes an irrational stretch of the imagination to suppose that Judge Parsons would on three occasions invite the parties to submit evidence to him concerning post-verdict conditions and then base his decree solely upon conditions as they existed in 1975. Third, in his decree in Ohio I, Judge Parsons in fact referred to post-verdict conditions. For example, he expressly addressed himself to the "1975 Sealy Uniform License Contract," an agreement executed subsequent to the verdict in Ohio I. It is thus plain that Judge Parsons did not defer until Ohio II consideration of an injunction against enforcement of the exclusive manufacturing territories provision based upon post-verdict conditions. He expressly asked the parties to inform him about post-verdict conditions and formulated his decree in light of those conditions the parties chose to bring to his attention.
 
 
 38
 Ohio also argues that it is entitled to litigate the issue of enjoining the exclusive manufacturing territories provision because Judge Parsons' opinion is not "coherent." This make weight argument need not delay us long. Judge Parsons' opinion painstakingly analyzes the propriety of several equitable measures. On the issue of the exclusive manufacturing territories provision, Judge Parsons determined that permitting a licensee to manufacture anywhere in the nation would be tantamount to permitting a licensee to appropriate the licensor's property; no licensee would ever again seek multiple licenses, for his single license would enable him to manufacture wherever he desired. We approved of Judge Parsons' reasoning when we affirmed the decree of equitable relief in 1982. Ohio may have preferred a different outcome on this aspect of the Ohio I litigation, but it cannot now legitimately argue that its claim received less than a coherent disposition in prior proceedings.
 
 
 39
 For the sake of completeness, we raise one argument concerning res judicata that Ohio failed to make in its present appeal to this court. In Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), the Supreme Court held that when legal and equitable claims are joined in one action, absent exceptional circumstances, a litigant has a right to have the issues common to the legal and equitable claims tried first to a jury. By virtue of our disposition of the first issue in this appeal, Ohio will now be entitled to proceed with its damages action. If we in addition hold that Judge Parsons' equitable relief proceeding in 1979 functioned as the equitable relief proceeding for Ohio I and Ohio II, it could be argued that Ohio is being forced in Ohio II to reverse the order of proceedings dictated by Beacon Theaters. Upon closer examination, however, this argument fails. Beacon Theaters requires a judge, absent exceptional circumstances, to hear equitable claims after legal claims have been tried to a jury because a reverse order might infringe upon a litigant's right to a jury trial. If the equitable proceeding were held first, principles of former adjudication would preclude the jury's consideration of issues necessarily and actually decided by the judge. In the instant case, the rationale articulated in Beacon Theaters behind having the legal proceeding come first, however, is inapplicable. The preclusive effects, if any, that follow from the proceeding before Judge Parsons will follow whether we label that proceeding "the equitable proceeding for Ohio I " or "the equitable proceeding for Ohio I and Ohio II." There accordingly would be nothing gained by postponing the equitable relief proceeding in Ohio II until after jury trial on the damages claim. The parties to the damages action in Ohio II will have no greater opportunity to try issues to the jury if we were to consider the equitable proceeding in Ohio II not to have yet taken place.
 
 CONCLUSION
 
 40
 Having considered all the arguments urged by the parties to this appeal, we conclude that Ohio may proceed with its damages action against defendants to recover such post-verdict damages as it is able to prove for the period between April 1975 and April 1978 as a result of Sealy's pre-verdict acquisitions of the Philadelphia, Florida, and Pittsburgh licensees and pre-verdict refusal of a Toledo plant location, all as specified hereinbefore in this opinion. Ohio may not, however, proceed with its prayer for an injunction against enforcement of the exclusive manufacturing territories provision. The parties shall bear their own costs. The final judgment entered in the district court accordingly is AFFIRMED IN PART, REVERSED IN PART, and the cause is REMANDED to the district court for proceedings consistent with this opinion.
 
 
 
 *
 Stanley A. Weigel, Senior District Judge of the Northern District of California, sitting by designation
 
 
 [1]
 When we use the terms "Ohio I," "Ohio II," and "Ohio III" in this opinion, we refer to entire lawsuits, not to the successive occasions a particular cause of action has been before this court
 
 
 [2]
 Much of this discussion is derived from this court's opinion in Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d 821 (7th Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979)
 
 
 [3]
 The Sealy Court dealt with an aggregate of trade restraints, including horizontal market allocation as well as minimum retail price fixing. In United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), the Supreme Court removed the ambiguity created by Sealy; the Topco Court held that horizontal territorial restraints even if unaccompanied by price fixing are considered per se illegal. 405 U.S. at 609 & n. 9, 92 S.Ct. at 1134 & n. 9